A.      GA Dept of Labor Transcript



# GEORGIA DEPARTMENT OF LABOR

148 ANDREW YOUNG INTERNATIONAL BLVD., NE · ATLANTA, GEORGIA 30303-1751

MARK. BUTLER
COMMISSIONER

July 29, 2011

**VIA HAND DELIVERY**
Ms. Amy E. Barnes
886 Wanda Circle, S.W.
Marietta, Georgia 30088

   **RE: Request for Unemployment Appeal Hearing Transcript**
      **Docket #23437-11 | Amy E. Barnes v. Publix Super Markets**

Dear Ms. Barnes:

Enclosed is a copy of a transcript from the above-referenced unemployment insurance appeal hearing, conducted on June 27, 2011, which the Georgia Department of Labor may disclose pursuant to O.C.G.A. § 34-8-121(b)(3).

Sincerely,

Shari N. Speer
Legal Services/Disclosure Officer
UI Legal Section

An Equal Opportunity Employer

BOARD OF REVIEW

EMPLOYMENT SECURITY AGENCY

STATE OF GEORGIA

IN RE:   CLAIM OF:              )
                               )
AMY E. BARNES                  )   DOCKET NO. 23437(11)
886 WANDA CIRCLE SOUTHWEST     )
MARIETTA, GA  30088            )

HEARING CONDUCTED BY HON. JOHN A. MCDUFFIE,

ADMINISTRATIVE HEARING OFFICER, GEORGIA DEPARTMENT

OF LABOR, COMMENCING JUNE 13, 2011.

--------------------

APPEARANCES:

ON BEHALF OF THE CLAIMANT:    AMY E. BARNES
                              JOHN GALCZYNSKI, REPRESENTATIVE
                              CELIO BEST, INTERPRETER

ON BEHALF OF THE EMPLOYER:    KELLY CHARLES-COLLINS, SENIOR
                               HUMAN RESOURCE INVESTIGATOR
                              THOMAS SAYERS, STORE MANAGER
                              KEVIN KIDD, ASSISTANT STORE MANAGER

--------------------

TRANSCRIBED BY S. WATERS, CORPORATE SUPPORT, JULY 26, 2011.

1           HEARING OFFICER: Andy McDuffie,

2       Administrative Hearing Officer, it's

3       12:58 p.m. for Docket 23437. Claimant Appeal,

4       June 13th, 2011. Going to check the lobby for

5       the parties.

6           Parties are all in the lobby. The

7       Sign Language Interpreter is not here yet.

8       Andy McDuffie, Administrative Hearing,

9       Docket Number 23437, Claimant Appeal.

10          Today is June 27th, 2011, the time is now

11      12:55 p.m. I'm going to go to the lobby to

12      check the lobby for the parties. Come on in

13      and have a seat, please.

14          Um sir, if you'll just sit here and let

15      Ms. Barnes sit in the middle. The

16      Sign Language Interpreter can sit right there

17      I think -- do you need to sit right across

18      from her?

19          INTERPRETER CELIO BEST: You'll be

20      leading the meeting?

21          HEARING OFFICER: I'll be holding the

22      hearing, sir.

23          INTERPRETER CELIO BEST: Kind of where

24      she can see you and hear --

25          HEARING OFFICER: If she's got -- you

2

```
 1              need her to sit there?

 2                   INTERPRETER CELIO BEST:  I can sit across

 3              from here.

 4                   HEARING OFFICER:  Well, could you sit --

 5              will it work if she sits right there?

 6                   INTERPRETER CELIO BEST:  The person who

 7              is talking --

 8                   AMY E. BARNES:  That's where I sat --

 9                   HEARING OFFICER:  Sit right there, sir.

10                   INTERPRETER CELIO BEST:  Thank you.

11                   HEARING OFFICER:  Sit there, and, ma'am,

12              you're the Employer Representative, if you'll

13              have a seat there, please.  One of you will be

14              right -- okay.

15                   INTERPRETER CELIO BEST:  She says she

16              would prefer me sit right here.

17                   HEARING OFFICER:  Okay, well, sir, you

18              sit over there and the Employer sit on that

19              side.

20                   It's 1:02 p.m.  Okay, so you're the

21              Interpreter, your first name, please?  I need

22              your name, sir?  I've got to put you under

23              oath before we do anything --

24                   INTERPRETER CELIO BEST:  Okay.

25                   HEARING OFFICER:  -- so I need you to
```

1          tell me your name, please?

2              INTERPRETER CELIO BEST:  Oh, I'm sorry my

3          name is Celio Best --

4              HEARING OFFICER:  Okay.

5              INTERPRETER CELIO BEST: --

6          C-E-L-I-O B-E-S-T.

7              HEARING OFFICER:  Okay, and do you

8          solemnly swear or affirm that you will

9          truthfully, um do sign language, translate and

10         interpret what's being said in this hearing to

11         the best of your ability so help you God?

12             INTERPRETER CELIO BEST:  I do.

13             HEARING OFFICER:  Okay -- okay, and,

14         ma'am, I want you to interpret in first person

15         everything that I say and everything that's

16         said for her.  Ma'am, you're the Employer

17         representative, your name?

18             KELLY CHARLES-COLLINS:  Kelly, K-E-L-L-Y

19         my last name is hyphenated it's

20         Charles-Collins.

21             HEARING OFFICER:  And your title with the

22         company?

23             KELLY CHARLES-COLLINS:

24         Senior Human Resources Investigator.

25             HEARING OFFICER:  Okay, and your name?

4

1           THOMAS SAYERS:  Thomas Sayers,
2      S-A-Y --
3           HEARING OFFICER:  S-A-Y?
4           THOMAS SAYERS:  -- E-R-S.
5           HEARING OFFICER:  E-R-S?
6           THOMAS SAYERS:  Correct.
7           HEARING OFFICER:  Your title with the
8      company?
9           THOMAS SAYERS:  Store Manager.
10          HEARING OFFICER:  And your name, sir?
11          KEVIN MURPHY:  Kevin Murphy, M-U-R-P-H-Y.
12          HEARING OFFICER:  And your title?
13          KEVIN MURPHY:  Regional Director.
14          HEARING OFFICER:  Okay, and the -- the
15     other witnesses you plan to call today in this
16     hearing, ma'am, that are out there?
17          KELLY CHARLES-COLLINS:  Um Kevin Kidd.
18          HEARING OFFICER:  K-I-D-D?
19          KELLY CHARLES-COLLINS:  Uh-hmm he's the
20     Assistant Store Manager.
21          HEARING OFFICER:  And these are witnesses
22     you plan to call right --
23          INTERPRETER CELIO BEST:  Okay, work with
24     me, Kevin, work with me?  I'm speaking for
25     her.

5

```
1              HEARING OFFICER:  Oh, okay -- okay, uh

2      well, let me right now just get the witness

3      list that they plan to call then, I'll get

4      yours as well.  These are witnesses you plan

5      to call, is that correct?

6           KELLY CHARLES-COLLINS:  Uh-hmm.

7           HEARING OFFICER:  Okay, the next witness?

8           KELLY CHARLES-COLLINS:  Patty Simmons.

9           HEARING OFFICER:  And what's her title

10     with the company?

11          KELLY CHARLES-COLLINS:

12     Customer Service Manager.

13          HEARING OFFICER:  And the next witness?

14          KELLY CHARLES-COLLINS:  Matt Crawley,

15     C-R-A-W-L-E-Y.

16          HEARING OFFICER:  And his title?

17          KELLY CHARLES-COLLINS:  District Manager.

18          HEARING OFFICER:  Okay, and, Ms. Barnes,

19     do you plan on calling any witnesses today in

20     this hearing?

21          JOHN GALCZYNSKI:  I'm going to be her

22     representative --

23          HEARING OFFICER:  Oh, you're the

24     representative, okay, sir, your name?

25          JOHN GALCZYNSKI:  My name is
```

6

```
1              John Galczynski.

2                   INTERPRETER CELIO BEST:  Say it again?

3                   JOHN GALCZYNSKI:  G-A-L-C-Z-Y-N-S-K-I.

4                   HEARING OFFICER:  Wait, uh G-A --

5                   JOHN GALCZYNSKI:  L, G-A-L Charlie,

6              Delta, Member --

7                   HEARING OFFICER:  Okay, start from the

8              beginning, sir --

9                   JOHN GALCZYNSKI:  Okay.

10                  HEARING OFFICER:  -- I have G-A-L-Z-Z --

11                  JOHN GALCZYNSKI:  No, Charlie, C.

12                  HEARING OFFICER:  Oh, okay, C-A-L --

13                  JOHN GALCZYNSKI:  No, G.

14                  HEARING OFFICER:  That's' what I just had

15             and you said it was wrong.  Okay, for her,

16             sir.

17                  JOHN GALCZYNSKI:  G-A-L --

18                  HEARING OFFICER:  Okay, stop, no, sir,

19             let's just stop and -- and go through this.

20                  JOHN GALCZYNSKI:  Okay.

21                  HEARING OFFICER:  G-A-L-Z-Z-Y, is that

22             correct?

23                  JOHN GALCZYNSKI:  No -- no, that is not,

24             G-A-L-C-Z-Y-N-S-K-I.

25                  HEARING OFFICER:  Okay,
```

7

```
1              G-A-L-C-Z-Y-N-S-K-Y, is that correct?
2                  JOHN GALCZYNSKI:  N-S-K-I.
3                  HEARING OFFICER:  Okay, and your first
4              name, sir, is John?
5                  JOHN GALCZYNSKI:  John.
6                  HEARING OFFICER:  And you're their
7              representative, is that correct?
8                  JOHN GALCZYNSKI:  That's correct.
9                  HEARING OFFICER:  Okay, and what
10             witnesses do y'all plan calling today in this
11             hearing?
12                 JOHN GALCZYNSKI:  Um there is a list
13             which I believe you should already have it
14             overlaps with the list that's, uh Counsel for
15             Publix has, um --
16                 HEARING OFFICER:  Are there any
17             additional witnesses that the Employer --
18                 JOHN GALCZYNSKI:  Yes, there is, um
19             Nick Boyer.
20                 HEARING OFFICER:  B-O-Y-E-R?
21                 JOHN GALCZYNSKI:  That is correct,
22             Kevin Kidd.
23                 HEARING OFFICER:  I already have that.
24                 JOHN GALCZYNSKI:  Patty Simmons.
25                 HEARING OFFICER:  I have that.
```

1           JOHN GALCZYNSKI:  Thomas Sayers.

2           HEARING OFFICER:  I have that.

3           JOHN GALCZYNSKI:  Lora, Arisi L-O-R-A.

4           HEARING OFFICER:  And the last name?

5           JOHN GALCZYNSKI:  A-R-I-S-I.

6           HEARING OFFICER:  Okay.

7           JOHN GALCZYNSKI:  Alicia A-L-I-C-I-A,

8      Hirsch, H-I-R-S-C-H.

9           HEARING OFFICER:  Okay -- okay, it's time

10     we're going to go ahead and get started.  Let

11     me ask you, um you said something while I was

12     outside I didn't want you to say it until you

13     got in here.  But, Mr. Murphy, wanted to come

14     back first what was the reason?

15          KELLY CHARLES-COLLINS:  I would like him

16     to be excused.  He subpoenaed him, but as you

17     can see he didn't name him as a witness and

18     I'm not calling him as a witness --

19          JOHN GALCZYNSKI:  Yes, he is, actually,

20     one of the witnesses --

21          KELLY CHARLES-COLLINS:  And he has

22     absolutely no knowledge about this case.

23          HEARING OFFICER:  Okay, well let me ask

24     you, Mr., um --

25          JOHN GALCZYNSKI:  The reason we --

                        9

```
1                  HEARING OFFICER:  Can I ask tell me what
2         is the -- the reason he's being called as a
3         witness?
4                  JOHN GALCZYNSKI:  The reason he's being
5         called here is to testify specifically
6         relating to the policies, procedures and
7         practices of Publix in this matter.
8                  There were, uh communications that were
9         made through that office of which he is
10        responsible for along with, um the policies
11        that were in effect at the time.  I'd like
12        testimony relating to that.
13                 HEARING OFFICER:  Okay, well, I think
14        that the -- the -- that Ms. Barnes'
15        representative has made, um has -- has made
16        point on why he wants to call him.
17                 So, I'm going to allow him to -- to -- or
18        remain as a witness, I'm sorry, but there is
19        certain things I have to do to be fair to both
20        sides.
21                 And that's one, uh I believe he's -- he's
22        met his burden on what he just said, ma'am, if
23        want to object you can object.  But at this
24        point --
25                 KELLY CHARLES-COLLINS:  I'm going to
```

1           object because he was not involved in any way

2           with Ms. Barnes' job at Publix.  In addition,

3           the District Manager is here he can testify

4           about policies and procedures.

5               Mr. Sayers is here he can testify about

6           policies and procedures that directly related

7           to her job and position at Publix.

8               We had a hearing over four hours, um the

9           last time  Mr. Murphy was not a witness.  And

10          he was able to get all the information that he

11          needed with regards to policies and

12          procedures.  So, at this time I would object

13          to him being called --

14              JOHN GALCZYNSKI:  And I'm going to object

15          to that objection --

16              HEARING OFFICER:  Okay --

17              AMY E. BARNES:  Next time, uh he can tell

18          about policies and procedures, DM he can't --

19          he can't believe --

20              KELLY CHARLES-COLLINS:  No, I'm going to

21          object to her testifying at this point --

22              HEARING OFFICER:  Okay, to be honest I

23          can't tell what she's saying, tell me what

24          she's saying, sir?  What is she saying, sir?

25              AMY E. BARNES:  Later the -- the DM said,

11

1          he didn't know, uh the policies about that we
2          needed to do in our region, he didn't know
3          about the policies in our region. But we need
4          a Regional, uh Manager we need a Regional
5          Manager.
6               HEARING OFFICER: Okay, I'm going to
7          allow him to testify, ma'am. I think they've
8          met their burden. Sir, I need you to go back
9          to the lobby and I'll call you back at the
10         appropriate time.
11              PATRICK MURPHY: Okay.
12              HEARING OFFICER: Um Ms. Barnes, I have
13         your address as 886 Wanda Circle, Southwest,
14         Marietta, Georgia, 30088, is that correct?
15              AMY E. BARNES: Yes, that's my address.
16              HEARING OFFICER: Okay, and I have the
17         Employer's address, the local address as
18         4401 Shallowford Road, Roswell, Georgia,
19         30075, is that correct?
20              KELLY CHARLES-COLLINS: Yes.
21              HEARING OFFICER: Okay, I have the
22         Employer's corporate address as P.O. Box 407,
23         Lakeland, Florida, 33802, is that correct?
24              KELLY CHARLES-COLLINS: Yes.
25              HEARING OFFICER: Okay, do you swear or

12

```
1               affirm that the testimony you're about to give
2               is the truth, the whole truth and nothing but
3               the truth so help you God, Ms., um
4               Mr. Boyer, I'm sorry, Mr. Sayers --
5                    THOMAS SAYERS:  Sayers.
6                    HEARING OFFICER:  Mr. Sayers, do you
7               swear or affirm that the testimony you're
8               about to give is the truth, the whole truth
9               and nothing but the truth so help you God?
10                   THOMAS SAYERS:  I do.
11                   HEARING OFFICER:  And, um Ms. Barnes, do
12              you swear or affirm that the testimony you're
13              about to give is the truth, the whole truth
14              and nothing but the truth so help you God?
15                   AMY E. BARNES:  Yes.
16                   HEARING OFFICER:  And -- and, ma'am, I'm
17              assuming you're not giving testimony, is that
18              correct?
19                   KELLY CHARLES-COLLINS:  Right, I'll do
20              the closing.
21                   HEARING OFFICER:  But you're not --
22              you're not giving sworn testimony?
23                   KELLY CHARLES-COLLINS:  No.
24                   HEARING OFFICER:  Okay, I know that I'm
25              recording the hearing, but I have to ask,
```

13

```
 1            anybody else in the room are they recording
 2            the hearing, Mr. Sayers, are you recording
 3            the hearing?
 4                 THOMAS SAYERS:  No.
 5                 HEARING OFFICER:  Ma'am, are you?
 6                 KELLY CHARLES-COLLINS:  No.
 7                 HEARING OFFICER:  And, um --
 8                 JOHN GALCZYNSKI:  No.
 9                 HEARING OFFICER:  -- Mr. Galczynski, are
10            you recording the hearing?  Ms. Barnes?
11                 AMY E. BARNES:  No.
12                 HEARING OFFICER:  Sir, are you?
13                 INTERPRETER CELIO BEST:  No.
14                 HEARING OFFICER:  Okay, all right, I'm
15            going to go over a brief opening statement.
16            This hearing is designed to be informal when
17            compared with a courtroom setting.
18                 Even though it's informal the Law
19            requires all testimony be taken under oath.
20            In just a few minutes I'll go over the
21            documents that I have in the file, I'll number
22            them and enter them into the record.
23                 Having done that I'll open the hearing
24            for testimony.  Each side will have the
25            opportunity to testify.
```

1           Each side will have the opportunity to
2      cross-examine or question the testimony of
3      the other.
4           You will further have the opportunity to
5      question any witness that appears in your
6      behalf as well as cross-examine or question
7      any witness that appears for the opposing
8      side.
9           You will also have an opportunity to make
10     any additional statements and closing remarks
11     you want to make relative to the issues in
12     this case.
13          Once all testimony is in relative to
14     those issues I'll declare the hearing at a
15     close.
16          You will not receive a Decision today
17     I'll have a typewritten Decision mailed to
18     you.  If you disagree with my Decision you
19     have the right to file an Appeal to the
20     Board of Review.
21          The Board of Review as their name implies
22     will go over a tape of this hearing for its
23     technical and legal inaccuracies.
24          They will not and I repeat they will not
25     accept any additional testimony or new

1           evidence at their hearing.

2               It is therefore, necessary that you get

3           on the record today at this hearing all the

4           facts you want to have considered in relation

5           to the issues in this case.

6               Do either one of you have any questions

7           about how we're going to do the hearing

8           today --

9               JOHN GALCZYNSKI:  I do.

10              HEARING OFFICER:  And your question?

11              JOHN GALCZYNSKI:  Uh my question is I'd

12          like to introduce into evidence, uh subject to

13          review by, um Publix Counsel, uh their policy,

14          um guidelines as well as their practices.

15              HEARING OFFICER:  Okay, in just a minute

16          I'll go over, uh I'll give you an opportunity,

17          both sides to give any documents like that in

18          just a few seconds.  But any other questions

19          about how we're going to proceed with the

20          hearing today?

21              JOHN GALCZYNSKI:  Um yes, uh essentially

22          I wanted to meet the burden that are required

23          under OCGA for the purposes of this hearing.

24          I wanted to, uh initially begin with testimony

25          from Nick Boyer and --

16

1           HEARING OFFICER:  Well, I'm not -- you're

2      not going to dictate the order we --

3           JOHN GALCZYNSKI:  I'm asking --

4           HEARING OFFICER:  -- have testimony, I

5      will go over the order of testimony in just a

6      few minutes, I haven't gotten that far yet.

7           JOHN GALCZYNSKI:  Okay.

8           HEARING OFFICER:  Any other questions?

9           JOHN GALCZYNSKI:  Um no, I -- I think we

10      can take whatever comes along as we go along.

11           HEARING OFFICER:  Okay, all right, ma'am,

12      do you have any questions?

13           KELLY CHARLES-COLLINS:  No.

14           HEARING OFFICER:  Okay, I'm going to go

15      over the issues on the Notice.  Before I go

16      over the -- let me just go over the issues one

17      by one at this time.

18           The first issue is the Quit issue.  The

19      issue is whether the Claimant had a good work

20      connected cause for leaving the Employer or

21      whether the Claimant voluntarily accepted the

22      separation due to a lack of work.

23           Issue Number 2 is the Discharge issue,

24      whether the Discharge or suspension of the

25      Claimant was for a failure to follow orders,

17

```
 1              rules or instructions or for a failure to
 2              perform the duties for which employed.
 3                   Issue Number 3 is whether supplied
 4              written Separation Information to the
 5              Department of Labor in a timely manner.
 6                   The issues I went over, do either one of
 7              you have any questions about how we're going
 8              to do the hearing today, Mr. Galczynski, any
 9              questions?
10                   JOHN GALCZYNSKI:  Um I intend to show
11              constructive Discharge relating to those
12              issues and, um -- um my questions are, uh
13              simply if you have any exceptions or
14              additional information relating to that?
15                   HEARING OFFICER:  Do I have any to give
16              you --
17                   JOHN GALCZYNSKI:  No, discount the
18              question and then, I'll just proceed.
19                   HEARING OFFICER:  Okay, ma'am, do you
20              have any questions?
21                   KELLY CHARLES-COLLINS:  No.
22                   HEARING OFFICER:  Um I know I wrote it
23              down, but tell me again, you're Ms. Collins,
24              right?
25                   KELLY CHARLES-COLLINS:  Yes.
```

1               HEARING OFFICER:  Okay, I have a copy of

2       the Claims Examiner's Determination.  It

3       states disqualification began on November 7th,

4       2010.

5               It also says signed timely Separation

6       Information was received.  And this document

7       was mailed out on December 2nd, 2010.

8               I'm showing this to all parties.  I need

9       to enter this into the record because this is

10      the original basis for the Appeal.  Any

11      objection to me entering this into the record,

12      sir, Mr. Galczynski?

13              JOHN GALCZYNSKI:  No.

14              HEARING OFFICER:  Any objections

15      Ms. Collins?

16              KELLY CHARLES-COLLINS:  No.

17              HEARING OFFICER:  Entering the

18      Claims Examiner's Determination into the

19      record as Exhibit 1.

20              INTERPRETER CELIO BEST:  You said did

21      she --

22              HEARING OFFICER:  Well, I asked her

23      representative.

24              INTERPRETER CELIO BEST:  Oh.

25              HEARING OFFICER:  And he said, no.

19

```
 1              Before I go any farther I'm going to ask both
 2              parties a question and it will determine how -
 3              - how I -- what order I proceed in.  Um
 4              Ms. Collins, was this a situation where
 5              Ms. Barnes quit in lieu of Discharge?
 6                   KELLY CHARLES-COLLINS:  No.
 7                   HEARING OFFICER:  And, sir, is it your
 8              contention that she quit her job in lieu of
 9              Discharge?
10                   JOHN GALCZYNSKI:  Uh essentially that
11              there was constructive termination.
12                   HEARING OFFICER:  Are you -- you're
13              saying that she -- if she had not quit she
14              would have been discharged, is that correct?
15                   JOHN GALCZYNSKI:  That is correct.
16                   HEARING OFFICER:  Okay, and you're
17              disagreeing with that, is that correct?
18                   KELLY CHARLES-COLLINS:  And she testified
19              to that fact last --
20                   HEARING OFFICER:  I need to --
21                   JOHN GALCZYNSKI:  She --
22                   HEARING OFFICER:  Stop -- stop, I need to
23              point out to both parties right here and now
24              there was a former -- it was a hearing in this
25              case I realize.
```

1          It was appealed and the Board of Review

2     remanded it back for a Denovo Hearing.  So,

3     that -- that last hearing I'm basing my

4     Decision today on this testimony -- in this

5     hearing today, ma'am.

6          Okay, it was remanded back to me to

7     conduct the hearing, uh a new hearing, so I

8     want you to understand that --

9          KELLY CHARLES-COLLINS:  I clearly

10    understand that, believe me, I understand

11    that.

12         HEARING OFFICER:  Okay.

13         KELLY CHARLES-COLLINS:  So, but I don't

14    think it's appropriate for just because they

15    were allowed to get a new hearing that they

16    come back and say something that is contrary

17    to what they testified to under oath.

18         HEARING OFFICER:  Okay.

19         KELLY CHARLES-COLLINS:  So, no, she was

20    not facing Discharge and I would object she

21    was not -- she was not facing --

22         HEARING OFFICER:  Okay.

23         KELLY CHARLES-COLLINS:  -- Discharge she

24    quit.

25         HEARING OFFICER:  Okay, go ahead, sir.

21

1        JOHN GALCZYNSKI:  I'm going to object to

2     her objection, this is a Denovo Review under

3     Denovo procedures.  We have a right to start

4     anew.

5        HEARING OFFICER:  And that's what we're

6     doing both parties.  Okay, I will conduct the

7     -- I will conduct the Employer's testimony

8     first.

9        After the Employer testifies, um

10    Ms. Barnes' representative, sir, you'll be

11    able to ask questions.

12       Before that, Ms. Collins, you'll be able

13    to ask questions.  I will get the Employer's

14    witness' testimony.

15       Um after that I will get Ms. Barnes'

16    testimony.  After Ms. Barnes testifies, um

17    Mr. Galczynski, and -- and, uh Ms. Collins,

18    you'll be able to ask questions.

19       After that I will get the Claimant's

20    witness' testimony.  After they testify both

21    sides will have the opportunity to ask them

22    questions.

23       After that we'll move to rebuttal

24    statements then, we'll move to closing

25    statements.  Um sir, as I'm going to get your

22

1          way I've always done --

2               KELLY CHARLES-COLLINS:  And I understand

3          I'm just putting it on the record --

4               HEARING OFFICER:  That's fine -- that's

5          fine, Mr. Sayers, um do you have the start

6          date of Ms. Barnes?

7               THOMAS SAYERS:  I don't know her start

8          date with the company.  I started working with

9          her in January of 2010.

10               HEARING OFFICER:  Okay, and what was the

11          day of separation?

12               THOMAS SAYERS:  She came in and resigned

13          on November 3rd, 2010.  I don't know the date

14          it was formally submitted.

15               HEARING OFFICER:  Okay, did she come to

16          you?

17               THOMAS SAYERS:  Uh she came to my

18          Assistant Store Manager, Kevin Kidd and then,

19          I was in the store.  I came up to the front

20          desk where she was and, uh I accepted her

21          resignation letter that she turned in.

22               HEARING OFFICER:  Did she give you at

23          that time did she give you any reasons?

24               THOMAS SAYERS:  She said she had found

25          another job, something dealing with

24

1          communications at a law firm.

2                  HEARING OFFICER:  And that's what she

3          told you on that day, is that correct?

4                  THOMAS SAYERS:  Yes, sir.

5                  HEARING OFFICER:  And was there available

6          work for her?

7                  THOMAS SAYERS:  Yes, she was scheduled to

8          work that week.  She was scheduled to work

9          that day at nine o'clock.  She came in at 8:50

10         and said she wasn't coming back to work.

11                 HEARING OFFICER:  Okay, she did not give

12         a notice?

13                 THOMAS SAYERS:  No, 10 minutes.

14                 HEARING OFFICER:  Okay, and you

15         personally spoke with her on that day, is that

16         correct?

17                 THOMAS SAYERS:  I did, yes, I did.

18                 HEARING OFFICER:  And --

19                 THOMAS SAYERS:  She thanked me for, you

20         know, everything I did for her.

21                 HEARING OFFICER:  And before that had she

22         come to you with any problems she was having?

23                 THOMAS SAYERS:  Uh we've had numerous

24         conversations about performance issues, yes.

25         She never came directly to me about problems

1          that she was having. But her and I had -- had
2          numerous conversations about her performance
3          issues.
4                    HEARING OFFICER: Um sir, before I move
5          on is there anything else you'd like to tell
6          me about?
7                    THOMAS SAYERS: Um I don't think so.
8                    HEARING OFFICER: Okay, Ms. Collins, do
9          you have any questions for Mr. Sayers?
10                   KELLY CHARLES-COLLINS: Did Ms. Barnes
11         give you a letter of resignation?
12                   THOMAS SAYERS: Yes.
13                   KELLY CHARLES-COLLINS: And at this time
14         I would like to admit into evidence the
15         resignation letter from Ms. Barnes. It should
16         be a part of the packet.
17                   HEARING OFFICER: I didn't see it, let me
18         go back through.
19                   KELLY CHARLES-COLLINS: It should be
20         towards the back of your --
21                   HEARING OFFICER: If I don't have it I'll
22         go make a copy of yours.
23                   KELLY CHARLES-COLLINS: Okay, it's
24         handwritten.
25                   HEARING OFFICER: Okay, I don't see it,

 1              let me go make a copy of yours.

 2                   KELLY CHARLES-COLLINS:  Okay.

 3                   HEARING OFFICER:  I'm going to step out

 4              of the room and go make copies of this

 5              document --

 6                   JOHN GALCZYNSKI:  I'm going to object.

 7                   HEARING OFFICER:  What's your objection?

 8                   JOHN GALCZYNSKI:  My objection is that

 9              Ms. Barnes was under duress.  Mr. Kidd, if

10              you'll read the email and I'd like to pause

11              for production of evidence on relating to the

12              email that was given earlier.

13                   Uh Mr. Kidd directed, uh the Claimant,

14              Amy Barnes to, uh write that letter and, uh

15              Ms. Barnes under knowledge that, um if -- if

16              you don't cooperate in the marketplace you are

17              not able to get further work.

18                   And given the number of calls in Publix

19              which have produced no references at all

20              relating to Ms. Barnes in various positions

21              that she had applied for it seems that, uh its

22              gone beyond that.

23                   HEARING OFFICER:  Well, I'm going to go

24              make a copy of this document right now.

25                   JOHN GALCZYNSKI:  Okay.

                              27

1          HEARING OFFICER: Uh because I looked
2      through the file and I don't see it in my
3      copies. And it should be -- it's stapled back
4      in one of these, uh mixed up, uh it will be
5      quicker to go make a copy.

6          So, I'm going to go make a copy of this
7      document. I've noted your objection for the
8      record, but as far as the document being in
9      the record I am going to enter the document in
10     the record.

11         JOHN GALCZYNSKI: That's fine.

12         HEARING OFFICER: I'm going to make a
13     copy of it I'm going to come right back and
14     while I'm out of the room please don't discuss
15     this case. I'll be right back. Okay, I'm
16     back in the room and here is your originals
17     back.

18         KELLY CHARLES-COLLINS: Thank you.

19         HEARING OFFICER: And, sir, there is a
20     copy for you as well. I am going to enter the
21     document in the record.

22         I'm entering the document as Employer's
23     Exhibit 1. Okay, um sir, at any time -- let
24     me back up and ask you one more time before I
25     move on.

28

1              At any time, Mr. Sayers, in your present
2          did you or did you witness anyone else
3          pressure
4          Ms. Barnes into writing this letter of
5          resignation?
6              THOMAS SAYERS:  No.
7              HEARING OFFICER:  Was it -- were you
8          present when she was asked to write it?
9              THOMAS SAYERS:  I was not present when
10         she was asked to write it.
11             HEARING OFFICER:  Were you present when
12   .      she wrote it?
13             THOMAS SAYERS:  No, not in her presence.
14         She handed it to me.
15             HEARING OFFICER:  Uh I'm going to move
16         on, ma'am, any other questions for your
17         witness?
18             KELLY CHARLES-COLLINS:  Are we going to
19         come back to him to go into details?  I'm not
20         sure if you're doing something preliminary.
21             HEARING OFFICER:  No, I'm not, uh do you
22         have any questions you want to ask him?
23             KELLY CHARLES-COLLINS:  Oh, yes.
24             HEARING OFFICER:  Go ahead.
25             KELLY CHARLES-COLLINS:  Mr. Sayers, you

29

1           were the Store Manager at Store 86 when
2           Amy Barnes worked there?
3                THOMAS SAYERS: Yes.
4                KELLY CHARLES-COLLINS: Okay, and when
5           she worked for you was she able to communicate
6           with you?
7                THOMAS SAYERS: Yes.
8                KELLY CHARLES-COLLINS: And was she able
9           to do that without, uh an Interpreter?
10               THOMAS SAYERS: Yes.
11               KELLY CHARLES-COLLINS: And as part of
12          her job duties, uh tell her what her job
13          duties were?
14               THOMAS SAYERS: Uh she was a
15          Customer Service staff, which meant that she
16          ran the front office counter. She was
17          responsible for answering telephones, uh
18          supervising associates, assisting customers.
19          She handled cash, she opened the office,
20          handled the safe.
21               KELLY CHARLES-COLLINS: Did she ever
22          need, uh anyone, uh any assistance with
23          answering the telephone?
24               THOMAS SAYERS: No.
25               KELLY CHARLES-COLLINS: Did she need any

```
 1              assistance with communicating with you,

 2              customers or other, um associates or Managers

 3              at the Publix store?

 4                   THOMAS SAYERS:  No.

 5                   KELLY CHARLES-COLLINS:  Um during her

 6              tenure at Store 86 did you have any

 7              performance issues with her?

 8                   THOMAS SAYERS:  Yes.

 9                   KELLY CHARLES-COLLINS:  Do you -- tell me

10              in general what those performance issues were?

11                   THOMAS SAYERS:  Uh punctuality was an

12              issue and, uh her supervisory skills were an

13              issue.  Her ability to stay on task and stay

14              focused.

15              Um had a confidentiality issue with her

16              where she would go into my office and read

17              documents that were private, not intended to

18              be read by other associates.

19              And she had issues with customers where

20              on several occasions she had misappropriate

21              conversations with them not related to a

22              shopping experience at Publix.

23                   KELLY CHARLES-COLLINS:  Do you recall an

24              incident that happened in May, um around

25              May 26$^{th}$ with a customer, did you receive a
```

31

```
1          customer complaint?
2                  THOMAS SAYERS:  I did.
3                  KELLY CHARLES-COLLINS:  Okay, can you
4          tell us about that customer?
5                  THOMAS SAYERS:  I received a, uh --
6                  HEARING OFFICER:  I need to point out to
7          all parties before I'm -- I'm not going to
8          allow him to testify to what the customer
9          complaint was because the customer -- it's
10         hearsay without the customer being called as a
11         witness to give firsthand testimony.
12                 KELLY CHARLES-COLLINS:  Okay, but she
13         received a counseling statement --
14                 HEARING OFFICER:  Well, that's different
15         that's -- that's -- I'm just saying he's --
16         he's testifying directly to the, um customer
17         complaint what the customer said, I'm not
18         going to allow that.
19                 KELLY CHARLES-COLLINS:  Right, but
20         hearsay would be if I was offering it for the
21         truth of the matter.  What I'm offering it for
22         is to show that he received a customer
23         complaint in that he --
24                 HEARING OFFICER:  If -- if -- the
25         question is regarding, um a written warning
```

32

1           that's -- that's different.  But I'm saying

2           he's testifying to what the customer said, I'm

3           -- I'm not going to allow that.

4                KELLY CHARLES-COLLINS:  Okay, on

5           May 26th did you issue -- May 26th or

6           May 27th did you issue Ms. Barnes a counseling

7           statement?

8                THOMAS SAYERS:  I did.

9                KELLY CHARLES-COLLINS:  And what was that

10          counseling statement for?

11               THOMAS SAYERS:  It was related to a call

12          I received from a customer complaining about

13          Amy's behavior at the register.

14               KELLY CHARLES-COLLINS:  Okay, and did you

15          discuss that complaint without telling us what

16          the complaint was, did you discuss that

17          complaint with Ms. Barnes?

18               THOMAS SAYERS:  I did.

19               KELLY CHARLES-COLLINS:  And did you, uh

20          when you issued her the counseling statement

21          was this the first time that you had spoken to

22          her about an issue like this?

23               THOMAS SAYERS:  Yes, I believe so, this

24          particular --

25               KELLY CHARLES-COLLINS:  You had -- had --

```
1            had you spoken to her about performance issues
2            prior to that?
3                 THOMAS SAYERS:  Uh yes, nothing
4            documented.
5                 KELLY CHARLES-COLLINS:  Okay.
6                 THOMAS SAYERS:  Just general coaching.
7                 KELLY CHARLES-COLLINS:  So, this was the
8            first written counseling that you were giving
9            her?
10                THOMAS SAYERS:  Yes, it was.
11                KELLY CHARLES-COLLINS:  All right, and
12           did you explain to her what would happen if
13           she failed to improve her behavior?
14                THOMAS SAYERS:  I did, I documented it on
15           the counseling statement.
16                KELLY CHARLES-COLLINS:  Okay, and what
17           was that?
18                THOMAS SAYERS:  Future occurrences would
19           lead to a five day suspension.
20                KELLY CHARLES-COLLINS:  And did you give
21           Ms. Barnes a copy of this counseling?
22                THOMAS SAYERS:  I did.
23                KELLY CHARLES-COLLINS:  And did she sign
24           it?
25                THOMAS SAYERS:  She did.
```

34

```
1              KELLY CHARLES-COLLINS:  I'd like to enter
2         this counseling statement dated May 27th, 2010
3         into evidence.
4              HEARING OFFICER:  Okay --
5              JOHN GALCZYNSKI:  I would like to review
6         that statement --
7              HEARING OFFICER:  Okay, you will, sir,
8         just a second, okay, let me find it in here.
9         I show one from October 10th, 2010 is that
10        not --
11             KELLY CHARLES-COLLINS:  No, May 27th,
12        2010.
13             HEARING OFFICER:  Just one second.  You
14        have two copies of that --
15             THOMAS SAYERS:  I do if you'd like --
16             HEARING OFFICER:  Do y'all have a copy of
17        this?
18             JOHN GALCZYNSKI:  No.
19             KELLY CHARLES-COLLINS:  They have been
20        provided a copy.
21             HEARING OFFICER:  I asked if they had a
22        copy at this time, ma'am, is what I was
23        asking.  Let me go make a copy of this for
24        y'all and I'll be right back.
25             Is there anything else you're going to
```

35

1          present that I need to make copies, so I can

2          make them all at one time?

3               KELLY CHARLES-COLLINS: I'm going to have

4          him -- Mr. Sayers --

5               HEARING OFFICER: That's fine.

6               KELLY CHARLES-COLLINS: -- October 10th.

7          Um do you have October 10th?

8               THOMAS SAYERS: I do.

9               KELLY CHARLES-COLLINS: And then,

10         November 2nd?

11              THOMAS SAYERS: I do.

12              KELLY CHARLES-COLLINS: Okay.

13              HEARING OFFICER: Okay, anything else,

14         ma'am --

15              KELLY CHARLES-COLLINS: No, that's it.

16              HEARING OFFICER: I'm going to make

17         copies for you, sir, I'll be right back with

18         these documents. Um while I'm out of the room

19         please don't discuss this case it's 1:35 p.m.

20         There you go, okay, the first one I have is

21         dated May 26th, 2010.

22              KELLY CHARLES-COLLINS: Yes, sir.

23              HEARING OFFICER: Okay.

24              KELLY CHARLES-COLLINS: May 27th is the

25         date that she signed it and that's --

```
 1                    HEARING OFFICER:  All right, Ms. Barnes,
 2        did you receive this warning, is that your
 3        signature on it?  Can you show it to her?
 4                    AMY E. BARNES:  Yes.
 5                    HEARING OFFICER:  Okay, and, sir, do you
 6        have any objection to me entering this
 7        document into the record?
 8                    JOHN GALCZYNSKI:  Um one is a
 9        characterization by, uh Counsel for Publix.
10        Um one gets the impression that, uh a
11        counseling statement is a, uh a document that
12        is punitive in nature.
13                    In fact, I'd like to introduce a
14        counseling statement that was, um nothing
15        short of an accolade for Ms. Barnes, um
16        reveling her performance, so that any of the
17        counseling statements must be taken within the
18        context of that, so that it isn't simply all,
19        uh unilaterally negative.  It is simply a
20        review.
21                    HEARING OFFICER:  Okay, I've noted your
22        objection for the record, but I am going to
23        enter the document into the record.  And I'm
24        entering the document into the record as
25        Employer's Exhibit 2.
```

37

1            JOHN GALCZYNSKI:  All right.

2            HEARING OFFICER:  Go ahead, sir.

3            JOHN GALCZYNSKI:  All right, I'd like to

4       enter a positive counseling statement --

5            HEARING OFFICER:  When I get to your

6       testimony I'll go over --

7            JOHN GALCZYNSKI:  Okay.

8            HEARING OFFICER:  -- all those with you

9       like I'm going over with the Employer right

10      now.

11           JOHN GALCZYNSKI:  All right, well, then,

12      um if you'll give me a few minutes I'd like

13      the opportunity to review this evidence that's

14      being presented?

15           HEARING OFFICER:  Go right ahead, sir.

16           JOHN GALCZYNSKI:  Thank you.  All right,

17      so we're going to label these dated on

18      the 26th as Number 2?

19           HEARING OFFICER:  Yes, the first one is -

20      - yes, letter of resignation is Employer

21      Exhibit 1.

22           JOHN GALCZYNSKI:  Okay, and we're going

23      to label the, uh one dated 10-10 as, uh

24      Exhibit Number 3 --

25           HEARING OFFICER:  No, I hadn't gotten

38

1           there yet.

2                   JOHN GALCZYNSKI:  Oh, I'm sorry.

3                   HEARING OFFICER:  I don't know if we are,

4           uh most likely, but I don't know.

5                   JOHN GALCZYNSKI:  Okay.

6                   HEARING OFFICER:  So, let's go over the

7           document first.  The next document, uh is

8           October 10th, 2010.  Mr. Sayers, were you the

9           one that administered this document?

10                  THOMAS SAYERS:  I was.

11                  HEARING OFFICER:  And what is this for?

12                  THOMAS SAYERS:  This is in reference to

13          an incident that occurred on October 5th when

14          Amy went into my office, uh to clean it while

15          she was in there she saw a paper on the desk

16          that had her name on it.  And she read that

17          paper.

18                  HEARING OFFICER:  Okay, how did you find

19          out about that?

20                  THOMAS SAYERS:  She brought it to the

21          attention -- she was upset about the paper and

22          she brought it to the attention of another

23          Manager.

24                  HEARING OFFICER:  And at any point did

25          you speak with her and ask whether she had

                              39

1       done that?

2              THOMAS SAYERS: I did.

3              HEARING OFFICER: What did she tell you?

4              THOMAS SAYERS: She said that she was in

5       there cleaning and she came across it and read

6       it inadvertently. And it was also witnessed

7       on a close circuit TV.

8              HEARING OFFICER: And --

9              JOHN GALCZYNSKI: I'm going to object to

10      that they're not presenting the evidence on

11      certain events.

12             HEARING OFFICER: Well, he can testify to

13      what she told him.

14             JOHN GALCZYNSKI: I understand that --

15      that wasn't --

16             HEARING OFFICER: Okay.

17             JOHN GALCZYNSKI: -- that wasn't the

18      nature of my objection -- my objection --

19             HEARING OFFICER: Well, uh the -- the --

20      I'll point out to all parties without a

21      videotape being entered into evidence if

22      someone testifies to what they saw on the

23      videotape it's hearsay. I'll point that out

24      to both party's right here and now.

25             JOHN GALCZYNSKI: Okay.

40

1          HEARING OFFICER:  Okay, um and was this

2     warning for reading what was on your desk?

3          THOMAS SAYERS:  Yes, that was half of the

4     counsel statement.  The other half was because

5     when she spoke to my Assistant Store Manager,

6     Kevin about it she cursed at him.

7          HEARING OFFICER:  Okay.

8          THOMAS SAYERS:  And that was the second

9     time that she --

10          HEARING OFFICER:  And did you -- did you

11     ask -- did you witness profanity?

12          THOMAS SAYERS:  No, I did not.

13          HEARING OFFICER:  Did you Ms. Barnes

14     whether she used profanity?

15          THOMAS SAYERS:  I did.

16          HEARING OFFICER:  What did she tell you?

17          THOMAS SAYERS:  She did she said that she

18     did.

19          HEARING OFFICER:  Um I'll ask you, sir,

20     before I move any farther.  Regarding this

21     document that I have here that you have a copy

22     of, do you have any objection with me entering

23     this document into the record?

24          JOHN GALCZYNSKI:  Um yes, um essentially

25     Ms. Barnes was complaining about working

1           conditions and working conditions are

2           protected each --

3                HEARING OFFICER:  Okay, I've noted your

4           objection for the record, but I don't find it

5           relevant.

6                JOHN GALCZYNSKI:  Okay.

7                HEARING OFFICER:  So, I am going to enter

8           the document into the record.  I'm entering

9           the document into the record as Employer's

10          Exhibit 3.  Okay, the next document I have is

11          dated November 2nd, 2010.  What is this, sir?

12               THOMAS SAYERS:  Um this is in reference

13          to a customer complaint that --

14               HEARING OFFICER:  This was never

15          administered, is that correct?

16               THOMAS SAYERS:  Correct.

17               HEARING OFFICER:  Okay, so at this time

18          I'm not entering this document into the record

19          that was never administered.  So, I'm not

20          entering it into the record.

21               KELLY CHARLES-COLLINS:  Well, he,

22          actually, did talk to her about the incident

23          that occurred.

24               JOHN GALCZYNSKI:  I'm going to object

25          she's testifying --

42

1              HEARING OFFICER:  Okay, ma'am, it says

2       here associate resigned or forwarded from

3       suspension what --

4              KELLY CHARLES-COLLINS:  No, I just want

5       to make it -- I wanted him to be able to

6       testify to what happened because he did,

7       actually, speak to her about it --

8              HEARING OFFICER:  Yeah, but --

9              KELLY CHARLES-COLLINS:  -- he didn't give

10      her the counseling statement --

11             HEARING OFFICER:  -- but the counseling

12      statement itself I'm not going to enter the

13      document in the record --

14             KELLY CHARLES-COLLINS:  That's fine.

15             HEARING OFFICER:  -- because it was never

16      administered.

17             KELLY CHARLES-COLLINS:  I understand

18      that.

19             HEARING OFFICER:  Okay.

20             KELLY CHARLES-COLLINS:  I just want to

21      make sure that he is -- I didn't want to just

22      move on from that.

23             HEARING OFFICER:  All right, do you have

24      any questions you want to ask him, ma'am?

25             KELLY CHARLES-COLLINS:  I do have lots of

```
1          questions I'd like to ask --

2              HEARING OFFICER:  Okay, go ahead -- go to

3          your next question, please.

4              KELLY CHARLES-COLLINS:  Um Mr. Sayers,

5          after you issued the counseling statement to

6          Ms. Barnes on May 27th did you have occasion

7          to have to have another discussion with her on

8          or about May 29th?

9              THOMAS SAYERS:  I did.

10             KELLY CHARLES-COLLINS:  And what was that

11         about?

12             THOMAS SAYERS:  That was performance

13         related.  She was scheduled to be at work at

14         Noon and I noticed it was five after Noon she

15         had not shown up for work yet.

16             And when she did arrive I asked her where

17         she had been and what she had been doing and

18         why she was late.

19             KELLY CHARLES-COLLINS:  What did she tell

20         you?

21             THOMAS SAYERS:  She said she was in the

22         Employee break room, um talking with some

23         other associates about how her day was going.

24         She had to go back to her locker to get her

25         breath mints and her lotion.
```

44

1            KELLY CHARLES-COLLINS:  And when you were

2       speaking to her was she insubordinate to you?

3            THOMAS SAYERS:  She was.

4            KELLY CHARLES-COLLINS:  And how was she

5       insubordinate?

6            THOMAS SAYERS:  Uh she -- she had, you

7       know, started to walk away, she didn't want to

8       hear what I had to say.  She said anyways and

9       turned away from me.  She didn't want to

10      accept my coaching.

11           KELLY CHARLES-COLLINS:  When you were

12      speaking to her where were you speaking?

13           THOMAS SAYERS:  Uh initially I was

14      speaking to her in front of the customer

15      service counter.

16           But as it turned into a coaching session

17      I need to direct her I pulled her to the side

18      where it was just her and myself.

19           KELLY CHARLES-COLLINS:  Were you loud

20      when you were speaking to her?

21           THOMAS SAYERS:  Not at all.

22           KELLY CHARLES-COLLINS:  Were you dressing

23      her down when you spoke to her?

24           THOMAS SAYERS:  Not at all.

25           KELLY CHARLES-COLLINS:  Were other

45

1          associates or customer present when you were

2          speaking to her?

3               THOMAS SAYERS:   Not within earshot where

4          they could have heard me.

5               KELLY CHARLES-COLLINS:   Did you in any

6          way treat her in an unprofessional manner when

7          you were speaking to her?

8               THOMAS SAYERS:   No, it was a coaching

9          session.

10              KELLY CHARLES-COLLINS:   Did you have to

11         speak to her -- did you speak with her later

12         that day?

13              THOMAS SAYERS:   I did.

14              KELLY CHARLES-COLLINS:   Tell me about

15         that?

16              THOMAS SAYERS:   Well, she was upset that

17         I had spoke to her and she said I had used

18         heavy words with her.

19              Her Supervisor, Patty Simmons had brought

20         that to my attention.   So, her, Patty and

21         myself sat down about three or four hours

22         later and we had some more discussion about

23         what had happened and why I was doing what I

24         was doing.

25              KELLY CHARLES-COLLINS:   And during that,

1           um conversation did you again talk to her

2           about performance issues?

3                 THOMAS SAYERS: I did.

4                 KELLY CHARLES-COLLINS: Okay, what were

5           those performance issues?

6                 THOMAS SAYERS: Um her leadership, uh her

7           punctuality, the same issues I had described

8           earlier.

9                 KELLY CHARLES-COLLINS: And did you

10          again, uh instruct her that she needed to have

11          appropriate conversations with customers?

12                THOMAS SAYERS: I did.

13                KELLY CHARLES-COLLINS: And did you tell

14          her gain that her failure to improve could

15          lead to further disciplinary action?

16                THOMAS SAYERS: I did.

17                KELLY CHARLES-COLLINS: During that

18          conversation did Ms. Barnes ask you something

19          about transferring to another store?

20                THOMAS SAYERS: She did.

21                KELLY CHARLES-COLLINS: Okay, and did you

22          -- did she say why she wanted to transfer?

23                THOMAS SAYERS: Uh I don't recall

24          specifically why she said she wanted the

25          transfer.

1              KELLY CHARLES-COLLINS:  Okay, did you
2         follow through on, uh submitting her request
3         for a transfer?
4              THOMAS SAYERS:  I did.
5              KELLY CHARLES-COLLINS:  And was she
6         transferred?
7              THOMAS SAYERS:  She was not.
8              KELLY CHARLES-COLLINS:  Why not?
9              THOMAS SAYERS:  Uh the store she was
10        wanting to transfer to said that they did not
11        need her.
12             She had only given me the one store,
13        Store 580 that she wanted to go to.  But they
14        did not have a position available for her at
15        that time.
16             KELLY CHARLES-COLLINS:  If they don't
17        have a position available then, she can't go
18        to that store, correct?
19             THOMAS SAYERS:  Correct.
20             KELLY CHARLES-COLLINS:  Um was there an
21        incident that happened in July of -- in July
22        that caused you to issue -- caused you to have
23        to speak to her?
24             THOMAS SAYERS:  Yes, there was.
25             KELLY CHARLES-COLLINS:  But you were not

48

1          present for the actual incident, correct?
2                    THOMAS SAYERS:  I was not.
3                    KELLY CHARLES-COLLINS:  But you did have
4          to coach her?
5                    THOMAS SAYERS:  I did.
6                    KELLY CHARLES-COLLINS:  Tell me what you
7          talked about when you were coaching her?
8                    THOMAS SAYERS:  Um the Manager in charge
9          was closing the store that night.  And as she
10         set the alarm Amy informed her that she had
11         left some milk in the refrigerator in the
12         deli.
13              The Manager in charge said, I'm sorry,
14         but we can't go back we have to leave the
15         store now.
16              They were still inside the store, but
17         they have to leave because they only have I
18         believe it's 60 seconds to exit the store.
19         Well, upon exiting the store Amy cursed at the
20         Managers that were there --
21                   HEARING OFFICER:  Okay, did you ask --
22         did you ever speak with Ms. Barnes and ask her
23         if she did this?
24                   THOMAS SAYERS:  Yes.
25                   HEARING OFFICER:  What did she tell you?

49

1              THOMAS SAYERS: She did.
2              HEARING OFFICER: Okay, go ahead.
3              KELLY CHARLES-COLLINS: Okay.
4              THOMAS SAYERS: Amy came in the next
5         morning -- I'm sorry.
6              KELLY CHARLES-COLLINS: Go ahead.
7              THOMAS SAYERS: Amy came in the next
8         morning to get her milk and she told me about
9         the incident.
10             She, actually, came in to get her milk,
11        but she also apologized for how she had
12        addressed the two Managers that closed that
13        night.
14             KELLY CHARLES-COLLINS: Did you write her
15        up for that?
16             THOMAS SAYERS: I don't think so.
17             KELLY CHARLES-COLLINS: You could have
18        written her up?
19             THOMAS SAYERS: Sure, I just -- I coached
20        her that morning she came in. I talked to her
21        about how she should speak appropriately to
22        Managers regardless of whether she's punched
23        in and on the clock.
24             She still needs to speak appropriately
25        and represent Publix appropriately especially

1          when she's in front of the store and other
2          associates are present.

3              KELLY CHARLES-COLLINS:  Um we talked
4          about the counseling statement that you issued
5          to her on October 10th.  In addition to --
6          what was the counseling statement for just in
7          general?

8              THOMAS SAYERS:  It was about her reading
9          the email on my desk and it was also about how
10         she reacted when she was spoken to about that,
11         how she cursed at the Manager that spoke to
12         her about regarding that document.

13             KELLY CHARLES-COLLINS:  And in addition
14         to giving her the counseling statement was
15         there any other actions taken?

16             THOMAS SAYERS:  Yes, she was reclassified
17         from a Customer Service staff to a Cashier.

18             JOHN GALCZYNSKI:  What was the date of
19         this?

20             HEARING OFFICER:  What was the date she
21         was, uh made a Cashier?

22             THOMAS SAYERS:  uh I don't have the date
23         that she was reclassified.  The date of the
24         counseling statement is October 10th.  The
25         date of the incident in question was

51

1    October 5th.

2         KELLY CHARLES-COLLINS:  So, she was, uh

3    reclassified to a Cashier?

4         THOMAS SAYERS:  Yes.

5         KELLY CHARLES-COLLINS:  Was she told that

6    was being done?

7         THOMAS SAYERS:  Yes.

8         KELLY CHARLES-COLLINS:  Um --

9         HEARING OFFICER:  What's your next

10   question?

11        KELLY CHARLES-COLLINS:  Did you explain

12   to her why she was being reclassified?

13        THOMAS SAYERS:  I did, lack of

14   confidentiality and professionalism.  The

15   position she was in was a position of

16   leadership.

17        She was in charge of anywhere from four

18   to 25 associates at one time.  She was also in

19   an area that was very confidential.

20        She was around personnel information,

21   other associate's information.  I could not

22   trust her to be in that position based on her

23   professionalism and her lack of

24   confidentiality.

25        KELLY CHARLES-COLLINS:  And in addition

```
 1              to reading the email on your desk she also, um

 2              told --

 3                   HEARING OFFICER:  I need you to form it

 4              in a question, okay, please.

 5                   KELLY CHARLES-COLLINS:  I'm going to ask.

 6                   HEARING OFFICER:  I -- I need you to go

 7              ahead and make it a direct question, not --

 8                   KELLY CHARLES-COLLINS:  I am.

 9                   HEARING OFFICER:  Go ahead.

10                   KELLY CHARLES-COLLINS:  Did she tell

11              anyone else about the email that she read on

12              your desk?

13                   THOMAS SAYERS:  She told another

14              associate that was working that night and she

15              -- two days later or a day later I'm not sure

16              of the exact timeline, but she approached, uh

17              Kevin Kidd, Assistant Store Manager and told

18              him.

19                   KELLY CHARLES-COLLINS:  Is she supposed

20              to be reading things that on your desk?

21                   THOMAS SAYERS:  No.

22                   KELLY CHARLES-COLLINS:  Um the email that

23              had her name on it was it a recent email?

24                   THOMAS SAYERS:  It was not it was from

25              May.  This just happened to be on my desk
```

```
1              because it was a list of other associates on
2              there that was a topic and she happened to see
3              her name in that list of associates.
4                   KELLY CHARLES-COLLINS: And her name was
5              in the middle of that email?
6                   THOMAS SAYERS: It was in the middle and
7              actually the name -- the associate it was left
8              for was highlighted. Her name was not
9              highlighted.
10                  KELLY CHARLES-COLLINS: Was that, um
11             okay, she was reclassified to a Cashier and
12             after that did you have to speak to her again
13             about any of her issues?
14                  THOMAS SAYERS: Yes, I did.
15                  KELLY CHARLES-COLLINS: And when was
16             that?
17                  THOMAS SAYERS: I spoke to her on
18             October 24th.
19                  KELLY CHARLES-COLLINS: And what was that
20             regarding?
21                  THOMAS SAYERS: Uh again, uh it had been
22             brought to my attention that, um Amy was
23             speaking to customers about inappropriate
24             things not related to a Publix shopping
25             experience.
```

54

```
1                    And I brought Amy into my office to ask
2           her about it she refused to answer.  I told
3           her if you're not going to answer my questions
4           I'm going to have to suspend you.
5                    KELLY CHARLES-COLLINS:  And how long did
6           you suspend her?
7                    THOMAS SAYERS:  I suspended her for
8           five working days.
9                    HEARING OFFICER:  When did the suspension
10          begin and when did it end?
11                   THOMAS SAYERS:  The suspension began on -
12          - I don't know the calendar day.  I know it
13          ended on November 2nd.  It was, actually, a
14          suspension covered two working weeks.
15                   It covered the ending two days of the
16          first week and the beginning three days of the
17          next week.
18                   HEARING OFFICER:  That was as
19          five day suspension?
20                   THOMAS SAYERS:  Five working day
21          suspension.  It might have covered more
22          calendar days, but that would encompass her
23          days off as well.
24                   Basically she was scheduled to return to
25          work on November 2nd, which is a Wednesday.
```

55

```
 1            And she would -- she was scheduled to work

 2            that Wednesday, Thursday and Friday of that

 3            week.  Which would be three days.

 4                Then, the previous week that the

 5            suspension started she worked two days.  She

 6            would have worked a total of five days over a

 7            two week span.

 8                HEARING OFFICER:  Next question, ma'am.

 9                KELLY CHARLES-COLLINS:  Was she scheduled

10            to return the 3$^{rd}$ or the 2$^{nd}$?

11                THOMAS SAYERS:  She was scheduled to

12            return on the 3$^{rd}$, I'm sorry.

13                KELLY CHARLES-COLLINS:  Okay, um did she

14            return to work?

15                THOMAS SAYERS:  That's the day we spoke

16            about earlier where she came in 10 minutes

17            before her scheduled, uh shift and she came in

18            -- in street clothes.  She had told us that

19            she was going to be taking a job somewhere

20            else.

21                KELLY CHARLES-COLLINS:  Either on

22            October 10$^{th}$ when you, uh reclassified her to

23            a Cashier or on October 24$^{th}$ when you

24            suspended her did you at any -- in any of

25            those conversations tell her that she was
```

56

1        being reclassified pending discharge or

2        suspended pending discharge?

3            THOMAS SAYERS:   Nothing pending

4        discharge.

5            KELLY CHARLES-COLLINS:   She was -- when

6        you spoke to her I know that you did not give

7        her a counseling statement when she was being

8        suspended.   But when you spoke to her did you

9        tell her that she was to return to work on

10       November 3rd?

11           THOMAS SAYERS:   I didn't at that time,

12       but she called later in the week and spoke

13       with Patty Simmons and Patty told her when she

14       was returning to work.

15           KELLY CHARLES-COLLINS:   And when you told

16       her she was suspended did you tell her at any

17       time that there was going to be a further

18       investigation or any other decisions made with

19       regards to her, um position at Publix?

20           THOMAS SAYERS:   No, she was scheduled to

21       return on November 3rd as a Cashier.

22           KELLY CHARLES-COLLINS:   And you spoke to

23       her on November 3rd and she gave you her

24       resignation letter.   Did she tell you, uh at

25       that time that she was forced to write this

1         letter?

2              THOMAS SAYERS:  No.

3              KELLY CHARLES-COLLINS:  Did she tell you,

4         um that Kevin asked her to write the letter?

5              THOMAS SAYERS:  No.

6              KELLY CHARLES-COLLINS:  Did she tell you

7         that she was resigning for any other reason

8         other than that she had another job?

9              THOMAS SAYERS:  No -- no, she seemed

10        fine, I mean she seemed upbeat happy.  She had

11        found another job that she wanted.

12             KELLY CHARLES-COLLINS:  Did you at any

13        time have an intention to discharge

14        Ms. Barnes?

15             THOMAS SAYERS:  No.

16             KELLY CHARLES-COLLINS:  Did you create

17        any type of hostile work environment such that

18        it would cause a reasonable person in her

19        position to want to quit?

20             THOMAS SAYERS:  No.

21             KELLY CHARLES-COLLINS:  I don't have any

22        other questions.

23             HEARING OFFICER:  Sir, do you have any

24        questions for --

25             JOHN GALCZYNSKI:  Yes, I do.

1              HEARING OFFICER: Go ahead, sir.

2              JOHN GALCZYNSKI: Mr. Sayers, I'd like

3       to, uh begin my questions, uh with, um -- um

4       first question is relating to the practice

5       handbook of Publix. Are you familiar with

6       this manual?

7              THOMAS SAYERS: I am.

8              JOHN GALCZYNSKI: And, um are you

9       required to apply this manual to your

10      management?

11             THOMAS SAYERS: Yes, are you talking

12      about the associate handbook?

13             JOHN GALCZYNSKI: Um at this time I would

14      like to introduce evidence, the associate

15      handbook.

16             HEARING OFFICER: Okay.

17             JOHN GALCZYNSKI: I have three copies of

18      that.

19             HEARING OFFICER: Okay, I'm going to give

20      y'all a copy.

21             JOHN GALCZYNSKI: Uh-hmm.

22             HEARING OFFICER: Okay, y'all can keep

23      one.

24             JOHN GALCZYNSKI: Certainly.

25             HEARING OFFICER: Okay, is this the

1           Employee handbook, ma'am, can you look at it
2           real quick and just tell me if --
3              KELLY CHARLES-COLLINS:  It appears to be,
4           I'll object to it being entered into evidence.
5           I don't know what the relevance is, but it
6           appears to be.
7              HEARING OFFICER:  Okay, well, I --
8              KELLY CHARLES-COLLINS:  It has a
9           publication date of June 12th, 2010.  It may
10          not be our current version, but it is --
11             HEARING OFFICER:  Okay, I'll note the
12          date on the front page of the publication
13          date.  I have noted your objection for the
14          record.
15             But I am going to enter the document into
16          the record.  I'll enter the document into the
17          record as Claimant's Packet Exhibit 1.  Go
18          ahead, sir, with your question.
19             JOHN GALCZYNSKI:  Um as, uh
20          Store Manager you would be familiar with what
21          the duties and responsibilities are as you've
22          covered in earlier testimony, Ms. Collins.
23             And, um my question to you is, uh is
24          customer service representative's management,
25          is that considered a managerial position?

1              THOMAS SAYERS:  No.

2              JOHN GALCZYNSKI:  And you had addressed

3              earlier in your testimony that she was in

4              charge of anywhere from four to 25 associates.

5             . THOMAS SAYERS:  Supervised, yes.

6              JOHN GALCZYNSKI:  She supervised, so in

7              effect she doesn't have a managerial title,

8              but she had a managerial position, is that

9              correct?

10             (gap in recording 63:00-63:04)

11             JOHN GALCZYNSKI:  Can you classify from

12             what the nature of her job duties are with

13             respect to management?

14             THOMAS SAYERS:  I don't understand the

15             question.

16             JOHN GALCZYNSKI:  The question is that

17             while Ms. Barnes, the Claimant does not have a

18             managerial title, um you indicated in your

19             testimony that she has managerial functions

20             as, uh there were four to 25 associates at any

21             given time that she supervises, is that

22             correct?

23             THOMAS SAYERS:  I didn't label them as

24             managerial functions, but that was part of her

25             job responsibility was supervising other

1          associates.

2               THOMAS SAYERS:  But essentially she's

3          not management?

4               THOMAS SAYERS:  She's not.

5               JOHN GALCZYNSKI:  Okay, so as she is not

6          management and the -- the role of privileged

7          information simply extends to management.

8               My question is at any point did you, um

9          ask, uh Ms. Barnes not to look at documents in

10         your office?

11              KELLY CHARLES-COLLINS:  I'm going to

12         object to the, um classifying evidence and --

13              HEARING OFFICER:  Uh what tell me your

14         objection again, please?

15              THOMAS SAYERS:  Uh not in evidence he

16         testified to, um he said something about the

17         privileged documents only go to management.

18              HEARING OFFICER:  Okay, I'm going to

19         allow the question, though because I think the

20         question is relevant.  Go ahead and ask the

21         question again, please --

22              JOHN GALCZYNSKI:  Okay, the question is

23         that, um while Ms. Barnes was repeatedly, uh

24         well, I'll ask you the question, okay --

25              HEARING OFFICER:  Ask the question

62

1            and --
2                JOHN GALCZYNSKI:  Right, that's what I'm
3            -- I'm going to, um do you have customer
4            service personnel including Amy Barnes go back
5            and periodically clean your office?
6                THOMAS SAYERS:  Yes.
7                JOHN GALCZYNSKI:  And did you ask
8            Ms. Barnes to clean your office on several
9            occasions?
10               THOMAS SAYERS:  Yes.
11               JOHN GALCZYNSKI:  And is it typical for
12           several people aside from Ms. Barnes to go
13           into that office?
14               THOMAS SAYERS:  Sure.
15               JOHN GALCZYNSKI:  And --
16               HEARING OFFICER:  I'm going to stop you,
17           do me a favor just answer yes or no and not
18           sure because sure or, uh it's hard to
19           understand, you know what that means.  Just go
20           ahead and answer yes or no.
21               THOMAS SAYERS:  All right.
22               JOHN GALCZYNSKI:  And it seems that, um
23           in -- in this event that, uh happened what
24           date was that -- that she, uh you said that
25           she went into your office?

1              THOMAS SAYERS:  It was around

2         October 5th.

3              JOHN GALCZYNSKI:  All right, and what

4         specific notice did you give Ms. Barnes

5         relating to the fact that she is not to read

6         or look at documentation?

7              THOMAS SAYERS:  None.

8              JOHN GALCZYNSKI:  None, so Ms. Barnes had

9         no notice of this, is that correct, not to

10        read the document?

11             THOMAS SAYERS:  She was never

12        specifically told not to read the document.

13             JOHN GALCZYNSKI:  All right, and I'm now

14        going to move from -- from that, um area to

15        questioning you areas that happened quite a

16        bit before then.

17             Um in your earlier testimony you

18        indicated that, uh she had received a number

19        of counseling statements which have been, uh

20        introduced into evidence.  And, um how would

21        you characterize Ms. Barnes' performance?

22             THOMAS SAYERS:  She had performance

23        problems.

24             JOHN GALCZYNSKI:  Okay, can you get

25        specific other than simply using you, could

64

```
 1              you possibly describe it clearly?
 2                   THOMAS SAYERS:  I've already described it
 3              twice under the --
 4                   JOHN GALCZYNSKI:  You can't --
 5                   THOMAS SAYERS:  -- testimony --
 6                   HEARING OFFICER:  You want to ask a
 7              specific question go ahead --
 8                   JOHN GALCZYNSKI:  Okay, all right,
 9              certainly, I'm going back to the earlier
10              testimony, so I'll have to, um did -- did
11              Ms. Barnes represent Pubilx to the testing for
12              the financial services, uh on behalf of the
13              store?
14                   KELLY CHARLES-COLLINS:  Objection --
15                   HEARING OFFICER:  Uh --
16                   JOHN GALCZYNSKI:  No, this is not going
17              to performance.
18                   HEARING OFFICER:  Okay, I don't
19              understand the question what you're asking you
20              need to make it more clear --
21                   JOHN GALCZYNSKI:  Okay, did she -- did
22              Ms. Barnes, the Claimant represent the
23              Store 86, Publix for testing by regional or
24              corporate for the, uh execution of financial
25              services, one of their job functions is
```

1          financial services?

2              KELLY CHARLES-COLLINS:  Objection,

3          relevance, um --

4              HEARING OFFICER:  Okay --

5              THOMAS SAYERS:  I testified that she had

6          -- that was part of her job responsibility.

7              JOHN GALCZYNSKI:  And I'm getting into

8          performance I'm going to cover the scope.

9              HEARING OFFICER:  Go ahead, sir.

10             JOHN GALCZYNSKI:  Okay, my question is,

11         um how did she fair in that performance

12         evaluation did your store pass?

13             THOMAS SAYERS:  I don't know the

14         evaluation you're' speaking of in particular.

15             JOHN GALCZYNSKI:  Uh-hmm.

16             THOMAS SAYERS:  But if you're asking if

17         there was any performance issues related to

18         her and financial transactions, no, not that I

19         can recall.

20             JOHN GALCZYNSKI:  Okay, um did

21         Ms. Barnes make, um problems continuously at

22         the customer service counter?

23             THOMAS SAYERS:  She did.

24             JOHN GALCZYNSKI:  Can you describe in

25         detail what those problems were?

1        THOMAS SAYERS:  I discussed it earlier,

2    but her lack of leadership --

3        JOHN GALCZYNSKI:  Okay, what does that

4    mean, can you define what a lack of leadership

5    means --

6        THOMAS SAYERS:  Sure, um it might be

7    five o'clock in the afternoon and Amy is not

8    paying attention to what's going on with the

9    Cashers and front service clerks and lines are

10   backing up.

11       And customers might be upset or people

12   aren't carrying out groceries.  She might be

13   doodling on a piece of paper not watching what

14   she's doing.

15       JOHN GALCZYNSKI:  And there was, uh an

16   incident since we're following down this road

17   with Mr. Nuci, did you hear anything about an

18   incident where, uh a customer came in at

19   eight o'clock in the morning and, uh

20   complained and would refuse to speak to

21   Ms. Laura Rece and would only speak to

22   Mr. Nuci.  Did -- were you aware of this?

23       THOMAS SAYERS:  Yes.

24       HEARING OFFICER:  I'm going to stop you

25   and tell you the same thing I told her, uh a

67

1          little while ago. Him testifying to what the
2          customer complained --
3               JOHN GALCZYNSKI:  No, I'm not --
4               HEARING OFFICER:  I'm just telling you it
5          sounds like you're going down that road.
6               JOHN GALCZYNSKI:  Okay, no.
7               HEARING OFFICER:  And what the customer
8          supposedly said or did not say is hearsay.
9          So, I can't into that it's why --
10              JOHN GALCZYNSKI:  Thank you, I appreciate
11         that, no, that's not where I'm going with
12         this.  Um what was done, uh with respect to
13         Ms. Barnes, um in terms of that particular
14         event?
15              THOMAS SAYERS:  I don't recall, uh I
16         didn't recall if I coached her or Patty
17         coached her on that particular event.
18              JOHN GALCZYNSKI:  What were you, um can
19         you recall the incident?
20              THOMAS SAYERS:  Yes.
21              JOHN GALCZYNSKI:  Can you describe the
22         incident?
23              THOMAS SAYERS:  Yeah, uh vaguely I'll do
24         the best I can, uh Amy was opening the office
25         that --

68

1           HEARING OFFICER:   Were you there?

2           THOMAS SAYERS:   I was not there.

3           HEARING OFFICER:   So, sir, he's

4      testifying to what --

5           JOHN GALCZYNSKI:   Okay.

6           HEARING OFFICER:   -- he has no firsthand

7      knowledge to.

8           JOHN GALCZYNSKI:   All right, so after

9      this incident occurred you -- what did you do

10     with respect to the Claimant, what, uh

11     statements took place, what happened after

12     that?

13          KELLY CHARLES-COLLINS:   Objection, asked

14     and answered --

15          THOMAS SAYERS:   I don't recall.

16          HEARING OFFICER:   Okay.

17          THOMAS SAYERS:   I don't recall if I

18     coached Amy on it or if Patty her immediate

19     Supervisor coached her on it.   Somebody did

20     speak to her about the incident.

21          JOHN GALCZYNSKI:   Okay.

22          THOMAS SAYERS:   I don't know the

23     specifics of the incident.   I don't recall the

24     specifics.

25          JOHN GALCZYNSKI:   All right, um was

1          Ms. Barnes written up at any point for that?

2                THOMAS SAYERS:   I don't believe so.

3                JOHN GALCZYNSKI:   And you indicated

4          testimony earlier where there was, um

5          Ms. Collins, uh said there was no heavy handed

6          words.   Did you threaten Ms. Barnes with

7          termination?

8                THOMAS SAYERS:   No.

9                JOHN GALCZYNSKI:   At no point you

10         threatened Ms. Barnes was termination?

11               THOMAS SAYERS:   Well, I mean on the

12         counseling statements I indicate if future

13         occurrences do occur then, it could lead to a

14         Discharge.

15               That's not a threat that's just a

16         statement of if she fails to improve this is

17         what could happen to her.

18               JOHN GALCZYNSKI:   Um you received a

19         request for a transfer by Ms. Barnes.   Do you

20         know what the date of that request was?

21               THOMAS SAYERS:   I don't know

22         specifically, it was around the end of May.

23               JOHN GALCZYNSKI:   All right, and what was

24         the reason Ms. Barnes gave you for -- were you

25         the recipient of this?

1           THOMAS SAYERS:  She did say that in the
2       meeting between myself and her and Patty.  It
3       was after the incident you're talking about
4       when we sat down and talked about that
5       incident later that day.  She said she wanted
6       to transfer.
7           JOHN GALCZYNSKI:  Okay.
8           THOMAS SAYERS:  She didn't give a reason.
9           JOHN GALCZYNSKI:  All right, and what was
10      done, um do you block transfers that are
11      problems?
12          KELLY CHARLES-COLLINS:  Objection, cause
13      for speculation --
14          HEARING OFFICER:  Okay, well, it's, uh --
15          KELLY CHARLES-COLLINS:  I'll strike if --
16          HEARING OFFICER:  Okay, one minute,
17      ma'am, let me make a decision on that.  Your
18      question is?
19          JOHN GALCZYNSKI:  My question is do you
20      block transfers that, uh you deem as problems?
21          THOMAS SAYERS:  I --
22          HEARING OFFICER:  I know you objected,
23      ma'am, but I am going to allow the question,
24      you can go ahead and answer.
25          THOMAS SAYERS:  Right, I do not block

71

```
 1              transfers, I personally do not as the
 2              Store Manager do not want to transfer
 3              associates that have performance issues.
 4                   JOHN GALCZYNSKI:  Okay, so in other words
 5              to make sure I understand this correctly,
 6              those individuals who have performance issues
 7              you're stating, uh you do not permit the
 8              transfer of those associates, is that correct?
 9                   KELLY CHARLES-COLLINS:  Objection,
10              statement is --
11                   THOMAS SAYERS:  It's my preference.
12                   JOHN GALCZYNSKI:  It's your preference,
13              okay, not to enable those transfers, so -- so
14              the transfer request that was put in --
15                   THOMAS SAYERS:  Uh-hmm.
16                   JOHN GALCZYNSKI:  -- in, uh May, uh
17              essentially what happened to it was it simply
18              put in the trashcan or what did you do with
19              respect to the request for transfer?
20                   THOMAS SAYERS:  Uh I emailed it to the
21              store she wanted to go to.
22                   JOHN GALCZYNSKI:  And you only have
23              one store as of record, is that correct?
24                   THOMAS SAYERS:  Uh yeah, I have an email
25              here it states that, uh my --
```

72

1        JOHN GALCZYNSKI:  Which email can you --

2        THOMAS SAYERS:  An email to my Assistant,

3    my Administrative Assistant if it's you

4    haven't already done so please send Amy's

5    transfer request to Store 580,

6    Lashonda Johnson, Matt Crawley and

7    Dawn Faven.  And I have a copy of the actual

8    transfer that was sent the day after.

9        JOHN GALCZYNSKI:  And at no time did you

10    block that?

11        THOMAS SAYERS:  No.

12        JOHN GALCZYNSKI:  Um did you speak with

13    any other store relating to her transfer?

14        THOMAS SAYERS:  Not that I recall.

15        JOHN GALCZYNSKI:  And when you dealt with

16    this transfer essentially went into the

17    system, but this was against what you would --

18    would typically do, you viewed her as a

19    problem, is that correct?

20        THOMAS SAYERS:  Yes.

21        JOHN GALCZYNSKI:  Okay, so as a problem,

22    um communication, did you have communications

23    with various stores or any stores, um relating

24    to, uh her performance issues?

25        THOMAS SAYERS:  No.

73

```
 1                    JOHN GALCZYNSKI:  And in the course of
 2          this six month period that this request for
 3          transfer went in did it at any time fall out
 4          of the system?
 5                    THOMAS SAYERS:  Objection, that's not in
 6          evidence.
 7                    JOHN GALCZYNSKI:  I'm asking --
 8                    HEARING OFFICER:  He's asking a question,
 9          I'm going to allow the question, go ahead.
10                    JOHN GALCZYNSKI:  At any time within the
11          course of that six months did the request for
12          a transfer which is typically done by email --
13                    THOMAS SAYERS:  Yes.
14                    JOHN GALCZYNSKI:  -- did that fall out of
15          the system?
16                    THOMAS SAYERS:  No.
17                    KELLY CHARLES-COLLINS:  Objection, same
18          objection --
19                    HEARING OFFICER:  Okay, your objection is
20          noted for the record.  I am going to allow the
21          question like I did the same question we had a
22          second ago.  Go ahead, sir, answer the
23          question, please.
24                    JOHN GALCZYNSKI:  And --
25                    HEARING OFFICER:  When you ask the
```

74

1           question he needs to go answer, go ahead.

2                THOMAS SAYERS:  No, it did not fall out

3           of the system.

4                HEARING OFFICER:  Okay.

5                THOMAS SAYERS:  The transfer is open for

6           six months.

7                JOHN GALCZYNSKI:  Okay, so in your

8           earlier testimony you indicated that, uh just

9           now that you had a contention with Ms. Barnes'

10          performance.  Was that grounds for you to, um

11          in any way impeded or block her, uh transfer?

12               THOMAS SAYERS:  Not at all, I would -- I

13          would disclose any performance issues to any

14          receiving store.

15               But I would never -- if they were willing

16          to accept those performance issues and

17          transfer her in I'd welcome the transfer.

18               HEARING OFFICER:  At any time did you

19          make Ms. Barnes aware that there was, uh an

20          email that in fact put her transfer through?

21               THOMAS SAYERS:  No, there was no email

22          that I'm aware of --

23               JOHN GALCZYNSKI:  There was no email, so

24          I'm going to now, uh --

25               THOMAS SAYERS:  That I'm aware of.

1           JOHN GALCZYNSKI:  Do you read your email,
2      you do?
3           THOMAS SAYERS:  I do read my emails.
4           JOHN GALCZYNSKI:  So, in your email, uh
5      I'm going to, uh call for that specific piece
6      of evidence which was subpoenaed and --
7           HEARING OFFICER:  Which email is that,
8      sir, do you have a copy of it --
9           JOHN GALCZYNSKI:  Um yes, I have to find
10     it.
11          AMY E. BARNES:  The big binder.
12          JOHN GALCZYNSKI:  Thank you.
13          THOMAS SAYERS:  I think I know the email
14     that you're speaking of.  I can speak of that.
15          HEARING OFFICER:  Okay, I'll need to get
16     a copy of it.
17          THOMAS SAYERS:  Okay.
18          JOHN GALCZYNSKI:  There is only one copy
19     here so there is going to have copies --
20          HEARING OFFICER:  What is the date of the
21     email do you know, sir?
22          JOHN GALCZYNSKI:  Let me find it.
23          HEARING OFFICER:  I may have a --
24          JOHN GALCZYNSKI:  The date of the email
25     is Tuesday, March 8th, 2011.  It says sent, uh

1              11:08 and it's to Kelly Charles-Collins and

2              the subject is Amy Barnes.

3              KELLY CHARLES-COLLINS: I'm going to

4              object that email that is the incorrect date.

5              You need to read the date of the actual email.

6              JOHN GALCZYNSKI: The date of the email

7              is November 2nd, 2010 at 3:40 p.m. and it's to

8              Mr. Crawley and the subject is Amy Barnes and

9              it is from Tom Sayers, is that --

10             HEARING OFFICER: Okay -- okay.

11             JOHN GALCZYNSKI: My question is in

12             addition to this email, um were there any

13             other emails that you had received relating to

14             a transfer that did in fact go through?

15             THOMAS SAYERS: No, that was the first

16             one and can I go back to the previous question

17             he had asked?

18             HEARING OFFICER: Uh-hmm.

19             THOMAS SAYERS: He asked had I

20             communicated that to Amy as he stated the

21             email was dated November 2nd.

22             Amy was on her suspension at that time

23             she never returned to work. If Amy had

24             returned to work she would have been

25             transferred to another store.

```
1              But she never returned to work she came
2         back to work on November 3rd, turned in her
3         letter of resignation.  That's why the email
4         was never communicated to Amy.
5              JOHN GALCZYNSKI:  Um so in other words,
6         no indication by the store -- was that typical
7         that a store would notify an Employee of a
8         transfer?
9              THOMAS SAYERS:  Sure.
10             JOHN GALCZYNSKI:  Okay, so in this
11        instance who directs that?
12             THOMAS SAYERS:  I would -- I would
13        probably --
14             JOHN GALCZYNSKI:  So, you would --
15             KELLY CHARLES-COLLINS:  You need to let
16        him answer --
17             HEARING OFFICER:  Yeah -- yeah --
18             JOHN GALCZYNSKI:  I was going to the next
19        question.
20             HEARING OFFICER:  Okay, well, let him
21        finish his --
22             THOMAS SAYERS:  If you're asking me if
23        I'm going to call her at home while she's on
24        suspension to tell her of a transfer the
25        answer is no.
```

78

1               JOHN GALCZYNSKI:  Okay.

2               THOMAS SAYERS:  I would have told Amy

3          when she returned to work, but she chose not

4          to return to work she just chose to resign.

5               JOHN GALCZYNSKI:  Now, how many other

6          notifications of transfer via email that you

7          received relating to Ms. Barnes?

8               THOMAS SAYERS:  No.

9               JOHN GALCZYNSKI:  No, and so how may

10         stores are you aware of that, um Ms. Barnes

11         applied to?

12              THOMAS SAYERS:  The one.

13              KELLY CHARLES-COLLINS:  Objection.

14              THOMAS SAYERS:  Asked and answered.

15              HEARING OFFICER:  Okay, I believe he's

16         answered that more than once --

17              JOHN GALCZYNSKI:  Okay, all right, I just

18         want to make sure I nail that down --

19              HEARING OFFICER:  Okay, any other

20         questions, sir?

21              JOHN GALCZYNSKI:  Yes, um when you were

22         at the front counter on the, um, uh I'm trying

23         to recall --

24              AMY E. BARNES:  Was it the 29th?  That was

25         Thursday the 29th --

1                    KELLY CHARLES-COLLINS:  I object to her

2           testifying.

3                    AMY E. BARNES:  -- Thursday, the 29th.

4                    JOHN GALCZYNSKI:  I just can't recall the

5           dates.

6                    HEARING OFFICER:  Okay, what is she

7           referring to --

8                    JOHN GALCZYNSKI:  She's giving me the

9           date.

10                   HEARING OFFICER:  Okay.

11                   JOHN GALCZYNSKI:  The date of, uh --

12                   HEARING OFFICER:  She can give him the

13          date, uh I don't, I mean, normal -- ma'am, if

14          it was your witness doing the same thing I'd

15          allow the same thing, okay?  Okay, sir, do you

16          have any other questions?

17                   JOHN GALCZYNSKI:  Yes, I do.

18                   HEARING OFFICER:  Ask them please.

19                   JOHN GALCZYNSKI:  Um Ms. Barnes had, um

20          been called over by you in front of the store,

21          in front of customer service.  You had

22          indicated earlier, I don't have the date,

23          27th, 29th, um and you had indicated that this

24          was --

25                   AMY E. BARNES:  The 29th.

1          JOHN GALCZYNSKI:  The 29th and you had
2          indicated that this was, um, uh private, right
3          in front of the customer service counter, is
4          that correct?
5          THOMAS SAYERS:  Initially the a
6          conversation that started right in front the
7          customer service counter --
8          JOHN GALCZYNSKI:  Okay, in front of the
9          customer service counter.  And, um at that
10         point what directly did you, um say to
11         Ms. Barnes relating to, uh this incident, what
12         did you say to her to, um to deal with it, not
13         a generality, something specific that you had
14         said?
15         THOMAS SAYERS:  I went over the -- the
16         conversation that we had.  I don't know
17         exactly what you're asking me.
18         JOHN GALCZYNSKI:  Okay, what I'm asking
19         is what, uh did you threaten her with
20         termination?
21         THOMAS SAYERS:  No.
22         JOHN GALCZYNSKI:  And you -- your
23         testimony was you indicated there was nobody
24         there, did you look around?
25         THOMAS SAYERS:  As far as customer?

1        AMY E. BARNES:  Yes, as far as customers,
2    in other words, you're giving, uh an associate
3    a counseling statement relating to a behavior
4    which you didn't approve, is that correct?
5        KELLY CHARLES-COLLINS:  Objection, that
6    misstates the evidence she was not given
7    counseling.
8        HEARING OFFICER:  Okay, did --
9        JOHN GALCZYNSKI:  I'm going to object to
10   that objection because from what he had
11   testified earlier counseling statements are in
12   writing as well oral.
13       KELLY CHARLES-COLLINS:  Objection, there
14   was absolutely no evidence testified to that.
15       HEARING OFFICER:  Okay, I'm going to
16   allow the question if he can answer, go ahead
17   and answer it, sir.
18       THOMAS SAYERS:  Sure, uh I did not answer
19   a counseling statement to her at that time.
20   As I testified earlier, I coached her.
21       JOHN GALCZYNSKI:  Okay, coached.
22       THOMAS SAYERS:  I pulled her aside from
23   the customer service counter in front of the
24   lottery machine where there were not other
25   associates or customers around.  I coached her

82

1            in a very professional manner.

2                 JOHN GALCZYNSKI:  Can you describe what

3            you said specifically?  Did you threaten any

4            job changes at that point?

5                 (gap in recording 83:16-83:22)

6                 JOHN GALCZYNSKI:  Um did you tell her to

7            walk out the door?

8                 THOMAS SAYERS:  No, I told her if she

9            didn't want to accept my coaching she could go

10           work elsewhere.

11                JOHN GALCZYNSKI:  Um --

12                THOMAS SAYERS:  She started to walk away

13           from me as I testified earlier.  She said

14           anyways and as I was talking to her she turned

15           around like she didn't want to listen to me.

16           I told her it was not anyways that she needed

17           to listen to me.

18                JOHN GALCZYNSKI:  Did you, uh request

19           that, uh she go into the office to discuss

20           this?

21                THOMAS SAYERS:  Yes, as I testified

22           earlier about three to four hours later we

23           went into the office, her, myself and

24           Patty Simmons and we discussed the incident.

25                And she was upset -- Patty told her she

83

1               was upset about it, so I wanted to speak to
2          her about it.
3               JOHN GALCZYNSKI:  Can you indicate
4          specifically what upset means?
5               KELLY CHARLES-COLLINS:  Objection calls
6          for speculation.
7               JOHN GALCZYNSKI:  No, I'm asking him how
8          he --
9               HEARING OFFICER:  I think he can answer
10          how he --
11               THOMAS SAYERS:  I wasn't firsthand
12          witness to it, but Patty said she was crying.
13               JOHN GALCZYNSKI:  Did you know why?
14               THOMAS SAYERS:  Because I had spoke to
15          her.
16               JOHN GALCZYNSKI:  All right, and at the
17          point where Ms. Simmons, Patty Simmons and
18          yourself, Tom Sayers and Amy Barnes, the
19          Claimant went into your office do you have any
20          notations or records or recollections to that
21          effect?
22               THOMAS SAYERS:  Yes, there is an email
23          that highlights the conversations.  Patty took
24          some notes.
25               JOHN GALCZYNSKI:  Um can you describe the

84

1           nature of the relationship, uh or job function

2           that Patty Simmons has in this matter?

3                THOMAS SAYERS: She's the

4           Customer Service Manager.

5                JOHN GALCZYNSKI: Um is she the Manager,

6           uh directly over Amy Barnes?

7                THOMAS SAYERS: She is.

8                JOHN GALCZYNSKI: And, um why if

9           Ms. Simmons, Patty Simmons was her Manager

10          were you called into the matter?

11               THOMAS SAYERS: I didn't come into work

12          until one o'clock that day if I recall. And I

13          was on the front end managing the front end

14          and she was scheduled to come in at Noon.

15               JOHN GALCZYNSKI: And is it typical that

16          you have two meetings after, um a, uh coaching

17          subsequent to that?

18               KELLY CHARLES-COLLINS: Objection.

19               HEARING OFFICER: Okay, what's the

20          question again?

21               JOHN GALCZYNSKI: Is it typical to have

22          another meeting on the heels of the first

23          meeting, is that unusual, does that happen all

24          the time, what -- what happened?

25               KELLY CHARLES-COLLINS: Objection, it's

85

1    been specified --

2    JOHN GALCZYNSKI:  I'm asking a question.

3    HEARING OFFICER:  Okay, uh I'm going to

4  allow the question, ma'am, so I'm going to let

5  you answer the question.

6    THOMAS SAYERS:  That just depends on the

7  situation, I mean every coaching session is

8  different.

9    HEARING OFFICER:  Any other questions?

10    JOHN GALCZYNSKI:  Do you have to look at

11  Amy Barnes to speak to her or she does not

12  understand you?

13    THOMAS SAYERS:  At times.

14    JOHN GALCZYNSKI:  So, when you speak you

15  don't necessarily know if she hears you or

16  not?

17    THOMAS SAYERS:  I never had a problem.

18    JOHN GALCZYNSKI:  Okay, um so when she

19  answers the phone have you witnessed her

20  answering the phone?

21    THOMAS SAYERS:  Yes.

22    JOHN GALCZYNSKI:  Okay, does she have a

23  problem listening to people on the phone?

24    THOMAS SAYERS:  I haven't heard of a

25  problem.

1        opinion, do you -- so I want you to restate

2        the question, please.

3            JOHN GALCZYNSKI:  All right, certainly,

4        um to your knowledge does Ms. Barnes suffer

5        from hearing loss?

6            KELLY CHARLES-COLLINS:  Objection, same

7        thing --

8            HEARING OFFICER:  Well, I'm going to --

9        even though he's asking if he has knowledge if

10       she has hearing loss, ma'am, that's a

11       different question.

12           THOMAS SAYERS:  From some other people

13       have told me that she might have hearing loss,

14       hearing problems.  But that's has never been a

15       problem with her performing her job.

16           JOHN GALCZYNSKI:  All right, so you

17       didn't have a job performance issue with her.

18       Now, you had indicated earlier in your

19       testimony that there was a problem with one

20       incident with, uh Laura Rece was she the

21       Manager when the, uh she couldn't --

22           HEARING OFFICER:  I want you to ask the

23       question instead of making a statement and

24       then, asking --

25           JOHN GALCZYNSKI:  All right, I was trying

```
 1              to keep it in context --

 2              HEARING OFFICER:  No, go ahead.

 3              JOHN GALCZYNSKI:  Okay, my question is

 4       you had indicated in your testimony that

 5       one night outside the store past closing off

 6       the clock, um Ms. Barnes had, uh cursed to, um

 7       Laura Rece and Kevin Kidd relating to her not

 8       being able to get her asthma inhaler and --

 9              HEARING OFFICER:  He never testified to

10       that.

11              JOHN GALCZYNSKI:  Okay, I'm sorry, are

12       you --

13              HEARING OFFICER:  No.

14              JOHN GALCZYNSKI:  -- I'm sorry, did

15       Ms. Barnes have asthma?

16              THOMAS SAYERS:  I don't know.

17              JOHN GALCZYNSKI:  So, you've never seen

18       her take an inhaler out?

19              THOMAS SAYERS:  No.

20              JOHN GALCZYNSKI:  Okay, and, um would you

21       be aware that she has asthma?

22              THOMAS SAYERS:  I just answered that --

23              HEARING OFFICER:  He just answered that

24       question --

25              JOHN GALCZYNSKI:  I'm sorry -- I'm sorry.
```

1          HEARING OFFICER:  Okay, um so you had a -

2     - a writing up after this where Mr. Kidd and

3     Laura Rece were at closing.  What time is

4     closing for that Publix store?

5          THOMAS SAYERS:  Well, first of all it

6     wasn't Kevin Kidd as I testified earlier it

7     was Joe Nucci.

8          JOHN GALCZYNSKI:  Okay.

9          THOMAS SAYERS:  And what's the question?

10         JOHN GALCZYNSKI:  The question is, um

11    that, uh Ms. Barnes was told that, uh she

12    cursed to, uh Laura Rece for this, uh hard

13    lock down relating to the fact that she

14    couldn't get her asthma inhaler --

15         HEARING OFFICER:  That is not -- no one

16    has testified to that, sir.

17         JOHN GALCZYNSKI:  Okay.

18         HEARING OFFICER:  And instead of you

19    making the allegation I want you to ask

20    questions, but I'm not going to allow --

21         JOHN GALCZYNSKI:  Okay.

22         HEARING OFFICER:  -- questions, there has

23    been no testimony given on -- on that.

24         JOHN GALCZYNSKI:  Were you aware that

25    Ms. Barnes was locked out of the store in the

90

1          presence of Joe Nucci and, uh Laura Rece?

2               KELLY CHARLES-COLLINS:  Objection that's

3          not in evidence.

4               HEARING OFFICER:  Okay, well, he's

5          testified to what happened and the warning

6          that he was given.  So, I'm going to allow the

7          question, go ahead, sir.

8               JOHN GALCZYNSKI:  Okay, um the question

9          stands were you aware of that incident where

10         Mr. Nucci and Laura Rece were outside the

11         store closing and, um Ms. Barnes, uh cursed

12         at, um Laura Rece for locking her out of the

13         store, were you aware of this?

14              THOMAS SAYERS:  I just testified to that.

15              JOHN GALCZYNSKI:  Okay, now, did you

16         punish Ms. Barnes in any way --

17              HEARING OFFICER:  I want you to answer --

18              THOMAS SAYERS:  I am aware of it.

19              JOHN GALCZYNSKI:  Okay, did you punish or

20         take steps towards or against Ms. Barnes

21         relating to this incident?

22              THOMAS SAYERS:  Uh nothing, uh formally,

23         uh I believe. I verbally coached her.

24              JOHN GALCZYNSKI:  What did you do?

25              KELLY CHARLES-COLLINS:  Objection, asked

91

```
1          and --
2               HEARING OFFICER:  He testified he
3          verbally coached her.  I don't -- let me ask
4          you, uh I let you go on for almost an hour,
5          sir.  How many other questions do you have of
6          this witness we've go --
7               JOHN GALCZYNSKI:  Well, uh there is,
8          uh --
9               HEARING OFFICER:  I'm just asking can you
10         answer that question, how many?
11              JOHN GALCZYNSKI:  Okay, her behavior off
12         the clock is not subject to their control.
13              KELLY CHARLES-COLLINS:  I'm going to
14         object and move to strike.  He asked --
15              HEARING OFFICER:  Okay, I'm asking a
16         question how many more questions do you have
17         for this witness.  We have multiple witnesses
18         trying to get their testimony today.
19              JOHN GALCZYNSKI:  Uh I'm simply
20         attempting to go through what he --
21              HEARING OFFICER:  I'm asking a question.
22              JOHN GALCZYNSKI:  I don't know, all I'm
23         giving is as the nature of the problems come
24         up, I can't answer your question.
25              HEARING OFFICER:  Okay, go ahead and ask
```

```
1              the questions, sir.

2                   JOHN GALCZYNSKI:  Um in -- in your

3              opinion does Ms. Barnes have any disability?

4                   KELLY CHARLES-COLLINS:  Objection, beyond

5              the scope of his knowledge and beyond the

6              scope of this hearing.

7                   JOHN GALCZYNSKI:  And -- and I'm going to

8              object to the objection because, um a

9              Store Manager, um would be charged with the

10             knowledge of when somebody has a disability.

11                  HEARING OFFICER:  Okay, I'm going to

12             allow the question, I've noted your objection

13             to the record, but I am going to sustain the

14             objection.  You can answer that question.

15                  THOMAS SAYERS:  Okay.

16                  JOHN GALCZYNSKI:  Are you aware of

17             Ms. Barnes, the Claimant having any

18             disability?

19                  THOMAS SAYERS:  It's been spoken of that

20             she has partial hearing problems.

21                  JOHN GALCZYNSKI:  Is that the only

22             problem she has?

23                  KELLY CHARLES-COLLINS:  Objection, cause

24             for speculation.

25                  HEARING OFFICER:  Okay, what --
```

1           JOHN GALCZYNSKI: Anything that you're
2      aware of?
3           THOMAS SAYERS: No.
4           HEARING OFFICER: Okay, any other
5      questions, sir?
6           JOHN GALCZYNSKI: Yes.
7           HEARING OFFICER: Go ahead.
8           JOHN GALCZYNSKI: Um let's go through
9      this, um -- um time when you had, um suspended
10     Ms. Barnes. Now, you had called Ms. Barnes in
11     your office, is that what happened?
12          THOMAS SAYERS: Yes.
13          JOHN GALCZYNSKI: Okay, why did you call
14     Ms. Barnes into your office?
15          THOMAS SAYERS: You're talking about the
16     suspension?
17          JOHN GALCZYNSKI: Yes, I am.
18          THOMAS SAYERS: It had been brought to my
19     attention --
20          JOHN GALCZYNSKI: Wait, who brought it to
21     your attention?
22          THOMAS SAYERS: Another associate.
23          JOHN GALCZYNSKI: Can you name them?
24          THOMAS SAYERS: Nick Boyer.
25          JOHN GALCZYNSKI: And what did

94

1       Mr. Boyer say to you?

2           THOMAS SAYERS:  Amy was having

3       inappropriate conversations with customers

4       about Bank of America.

5           JOHN GALCZYNSKI:  Is Mr. Boyer

6       management?  What is Mr. Boyer's position?

7           THOMAS SAYERS:  He's a Cashier.

8           JOHN GALCZYNSKI:  As a Cashier did you

9       request Mr. Boyer, uh to at any time to keep

10      an eye or monitor Amy's behavior?

11          THOMAS SAYERS:  Not at all.

12          JOHN GALCZYNSKI:  And when you say

13      inappropriate behavior what does that mean

14      exactly, did he give you something definite

15      and certain and clear indicating what the

16      nature of that behavior?  So, did you ask any

17      --

18          HEARING OFFICER:  Okay -- okay -- okay,

19      that's --

20          JOHN GALCZYNSKI:  I just --

21          HEARING OFFICER:  No -- no, sir, do me a

22      big favor.

23          JOHN GALCZYNSKI:  Okay.

24          HEARING OFFICER:  The tone of your voice

25      can you -- will you calm it down just a little

1          bit --

2              JOHN GALCZYNSKI:  Sure.

3              HEARING OFFICER:  -- please, I can hear

4          you very clear from where I'm at.  I'm on the

5          other end of the room and I can hear you very

6          clear.  Just calm it down just a little bit,

7          okay --

8              JOHN GALCZYNSKI:  Certainly.

9              HEARING OFFICER:  -- and the hostile, I

10         mean you may not notice it, but it's, uh it's,

11         uh well, a minute ago was kind of hostile.

12             JOHN GALCZYNSKI:  All right.

13             HEARING OFFICER:  So, just calm it down

14         just a little bit, okay?

15             JOHN GALCZYNSKI:  Okay.

16             HEARING OFFICER:  You can ask the same

17         question just a little calmer.

18             JOHN GALCZYNSKI:  Okay.

19             HEARING OFFICER:  I want you to re-ask

20         the question and let him answer it.

21             JOHN GALCZYNSKI:  Did you question

22         Mr. Boyer relating to something specific other

23         than a generic inappropriate behavior?

24             THOMAS SAYERS:  Nick had mentioned that

25         Amy was speaking about Bank of America to

```
1              customers.
2                    JOHN GALCZYNSKI:  And what did he say?
3                    THOMAS SAYERS:  What I told you.
4                    JOHN GALCZYNSKI:  Just that?
5                    THOMAS SAYERS:  I don't --
6                    JOHN GALCZYNSKI:  Did he say anything
7              else?
8                    THOMAS SAYERS:  Not that I can recall.
9                    JOHN GALCZYNSKI:  Okay, and so Mr. Boyer,
10             um had -- had -- you didn't question him
11             further?
12                   (gap in recording 95:42-95:46)
13                   JOHN GALCZYNSKI:  And after that what
14             happened?
15                   THOMAS SAYERS:  I brought Amy into my
16             office.
17                   JOHN GALCZYNSKI:  Brought what?
18                   THOMAS SAYERS:  Amy into my office.
19                   JOHN GALCZYNSKI:  And what happened?
20                   THOMAS SAYERS:  Uh I asked Amy if she was
21             having inappropriate conversations with
22             customers about Bank of America.
23                   I -- I had been made aware that, um just
24             five days prior Amy had a large sign posted to
25             the back of her car stating that
```

```
 1              Bank of America owed her money, something to
 2              that effect.
 3                   And I had concerns as a Store Manager
 4              that she is speaking to customer about
 5              Bank of America possibly Bank of America
 6              customers, um that they might be inappropriate
 7              conversations.
 8                   JOHN GALCZYNSKI:  And you didn't,
 9              actually, hear any conversation and
10              Mr. Boyer did he state explicated what she
11              said?
12                   THOMAS SAYERS:  No, not that I recall.
13                   JOHN GALCZYNSKI:  And your confidence
14              level in Mr. Boyer is medium high, you trust
15              him, what is your perception of --
16                   KELLY CHARLES-COLLINS:  Objection,
17              relevance?
18                   JOHN GALCZYNSKI:  Okay.
19                   HEARING OFFICER:  I'm going to sustain
20              the objection, go ahead --
21                   JOHN GALCZYNSKI:  You --
22                   HEARING OFFICER:  No, I sustain the
23              objection, sir, go to your next question.
24                   JOHN GALCZYNSKI:  Okay, um so then, when
25              you spoke with Ms. Barnes, what did you say
```

1           exactly?

2                THOMAS SAYERS:  I asked her, uh very

3           calmly if she had been having conversations

4           with customers about her issues with

5           Bank of America.

6                JOHN GALCZYNSKI:  And did she understand

7           you?

8                THOMAS SAYERS:  She didn't answer.

9                JOHN GALCZYNSKI:  Um --

10               THOMAS SAYERS:  I asked her again.

11               JOHN GALCZYNSKI:  -- did she ever ask you

12          to rephrase or, um restate any of your

13          questions?

14               THOMAS SAYERS:  No, she said she choose

15          not to answer me because she wanted -- she

16          wanted to have Counsel present or something to

17          that effect.

18               JOHN GALCZYNSKI:  And what was your

19          reaction?

20               THOMAS SAYERS:  Well, unfortunately based

21          on your previous counsel statement on

22          May 29th I'm going to suspend you for having

23          inappropriate conversations with customers.

24               JOHN GALCZYNSKI:  Um so at this time, um

25          she had already been demoted, is that correct?

99

1              THOMAS SAYERS:  Yes.

2              JOHN GALCZYNSKI:  And who demoted her?

3              THOMAS SAYERS:  I did.

4              JOHN GALCZYNSKI:  Okay, and why exactly

5         did you demote her?

6              THOMAS SAYERS:  Lack of professionalism

7         and lack of confidentiality.

8              JOHN GALCZYNSKI:  Okay, can you, uh

9         specifically enumerate what the scope or

10        definition of lack of professionalism is?

11             THOMAS SAYERS:  She was cursing as

12        Managers.

13             JOHN GALCZYNSKI:  Off the clock?

14             THOMAS SAYERS:  And on.

15             JOHN GALCZYNSKI:  When was she cursing on

16        the clock and about what?

17             THOMAS SAYERS:  When Kevin Kidd

18        questioned her about reading the emails in my

19        office.

20             JOHN GALCZYNSKI:  Any other incidents?

21             THOMAS SAYERS:  When she cursed at

22        Managers?

23             JOHN GALCZYNSKI:  That's correct.

24             THOMAS SAYERS:  The one that we talked

25        about earlier.

1           JOHN GALCZYNSKI:  In other words, the one
2           off the clock outside the store?
3               THOMAS SAYERS:  The one off the clock
4           outside the store.
5               JOHN GALCZYNSKI:  And let's cover the
6           nature of the suspension.  You -- the
7           suspension was to begin when, immediately?
8               THOMAS SAYERS:  Yes, that day.
9               JOHN GALCZYNSKI:  Okay, so I would like
10          to call into evidence the clock, um of Publix
11          which is in the normal course of their
12          business, um records.
13              Which, uh highlight and identify this, uh
14          the period of suspension.  So, to continue
15          with this let's first, um go to this, uh
16          record, any objections, Counsel?
17              KELLY CHARLES-COLLINS:  Yes, relevance
18          and I know what you're submitting --
19              JOHN GALCZYNSKI:  So, I'm admitting, uh
20          Publix relating to, uh documentation of when
21          her suspension began and what her notice was
22          under Pubilx's normal course of business.
23          Would you like to look at this it's a record -
24          - I'm asking you to look at it is that a
25          Publix record --

```
 1                    HEARING OFFICER:  You asked would he
 2          liked to look at it you didn't ask if --
 3                    JOHN GALCZYNSKI:  Okay, would you look
 4          at it?
 5                    KELLY CHARLES-COLLINS:  What date are you
 6          referring to?
 7                    JOHN GALCZYNSKI:  Okay, I'm referring to
 8          specifically the date, uh where, um the
 9          suspension, what was the date that suspension,
10          uh that evening what was that?
11                    THOMAS SAYERS:  I already stated I don't
12          recall.
13                    JOHN GALCZYNSKI:  Okay.
14                    THOMAS SAYERS:  I know the date that it
15          ended, I don't know the date it started.
16                    HEARING OFFICER:  I'm going to ask you to
17          move on, sir, I can't --
18                    JOHN GALCZYNSKI:  Okay, the reason I'm
19          going through the suspension specifically to
20          provide dates is, um Mr. Sayers had testified
21          that it was a five day suspension when in fact
22          it ran out to 10.  And given your earlier
23          context about the problems --
24                    AMY E. BARNES:  That day --
25                    HEARING OFFICER:  I'm going to get her
```

102

1        testimony, please tell her -- ma'am, I'm going

2        to get your testimony as soon as I can.  Okay,

3        there is a certain order I have to go

4        in, okay?

5             AMY E. BARNES:  All right.

6             JOHN GALCZYNSKI:  The reason I'm, um

7        bringing this forward to be introduced into

8        evidence is because it provides documentation,

9        uh using Publix normal business practices of

10       their records relating to the, um affects of

11       the suspension with Ms. Barnes.

12            HEARING OFFICER:  I've told you, sir, my

13       answer remains the same.  I think its'

14       relevant we're going to move on.  Do you have

15       any other questions?  That's my answer, uh

16       that's my Decision --

17            JOHN GALCZYNSKI:  Well, certainly and I

18       can object on the basis of the fact that, uh

19       I'm seeking to demonstrate constructive

20       termination and this is one of the --

21            HEARING OFFICER:  You objection is noted

22       for the record, sir --

23            JOHN GALCZYNSKI:  Thank you.

24            HEARING OFFICER:  -- go to your next

25       question.

1                JOHN GALCZYNSKI:  Okay, um okay, when did

2           you say the suspension started exactly?

3                KELLY CHARLES-COLLINS:  Objection, asked

4           and answered.

5                THOMAS SAYERS:  I don't recall.

6                JOHN GALCZYNSKI:  Okay, you don't recall,

7           what did you say to Ms. Barnes exactly at that

8           point?

9                KELLY CHARLES-COLLINS:  Objection, asked

10          and answered.

11               HEARING OFFICER:  I'm going to allow the

12          question, do you remember when you suspended

13          her do you remember what you said to her?

14               THOMAS SAYERS:  I said, unfortunately I'm

15          going to have to suspend you for five days

16          based off of previous counsel statements on

17          May 29th, inappropriate conversations with

18          customers is going to lead to a five day

19          suspension.

20               JOHN GALCZYNSKI:  At this point did you,

21          uh attempt to berate Ms. Barnes?

22               THOMAS SAYERS:  No.

23               JOHN GALCZYNSKI:  Did you threaten her

24          with termination?

25               (gap in recording 103:02-103:06)

1           JOHN GALCZYNSKI:  Did you indicate that
2      she might go again one further down to a
3      bagger?
4           THOMAS SAYERS:  No.
5           JOHN GALCZYNSKI:  Um so there was no
6      material change in job conditions?
7           THOMAS SAYERS:  No.
8           JOHN GALCZYNSKI:  And, um did you have
9      the expectation that Ms. Barnes would come
10     back at the conclusion of this suspension for
11     work?
12          THOMAS SAYERS:  Yes, she was scheduled to
13     work three days.
14          JOHN GALCZYNSKI:  Did you indicate at
15     this point that no one is to contact
16     Ms. Barnes relating to the fact that her
17     transfer had gone through?
18          THOMAS SAYERS:  No.
19          JOHN GALCZYNSKI:  Did you say -- did
20     Mr. Kidd to the best of your knowledge, uh
21     your Assistant Manager, uh indicate that there
22     is no information relating to this transfer
23     going through at this point?
24          KELLY CHARLES-COLLINS:  Objection --
25          HEARING OFFICER:  Okay --

1            THOMAS SAYERS:  I don't know.

2            HEARING OFFICER:  -- you'll have to ask

3       Mr. Kidd when he gets back here what his --

4       what he did or did not do.

5            JOHN GALCZYNSKI:  All right, and on -- on

6       the suspension is it typical that you provide

7       a written suspension at that point?

8            THOMAS SAYERS:  No.

9            JOHN GALCZYNSKI:  Depends on what?

10           THOMAS SAYERS:  Depends on the nature of

11      the incident.

12           JOHN GALCZYNSKI:  Okay, can you elaborate

13      on that, please --

14           THOMAS SAYERS:  At the time I suspended

15      her she was uncooperative, she would not speak

16      with me.  I told her that she -- she was going

17      to be suspended for five days and upon her

18      return I would have a counsel statement for

19      her to sign.

20           JOHN GALCZYNSKI:  Did Ms. Barnes ask you

21      any questions relating to this?

22           THOMAS SAYERS:  No.

23           JOHN GALCZYNSKI:  Did she ask you to

24      restate it, nothing?

25           THOMAS SAYERS:  Objection, asked and

1       answered.

2           JOHN GALCZYNSKI:  Okay, um so you asked

3       her did you ask her to immediately log off?

4           THOMAS SAYERS:  Yes.

5           JOHN GALCZYNSKI:  Uh so in effect her

6       suspension became immediate from that point?

7           THOMAS SAYERS:  Yes.

8           JOHN GALCZYNSKI:  Okay, I want to make

9       sure I've got it --

10          KELLY CHARLES-COLLINS:  Objection, asked

11      and answered --

12          HEARING OFFICER:  Okay -- okay, I'm going

13      to allow the question has been asked and

14      answered, ask the question again.

15          JOHN GALCZYNSKI:  The question is, um the

16      suspension began five days from that point

17      where you indicated to Ms. Barnes the meeting

18      was over or, uh however you indicated it.  Did

19      it begin immediately from that point?

20          THOMAS SAYERS:  Yes.

21          JOHN GALCZYNSKI:  Okay, and did any --

22      are you aware of -- of anybody going in and

23      changing schedules after you, uh make

24      notification to what schedules is or

25      suspension or unpaid absence or any of that?

```
1              KELLY CHARLES-COLLINS:  Objection that's

2         not in evidence.

3              JOHN GALCZYNSKI:  I'm asking for his

4         awareness of it.

5              HEARING OFFICER:  Tell me -- ask that

6         again, please.

7              JOHN GALCZYNSKI:  I'm asking for your

8         awareness of any person within management of

9         going into a schedule and making modifications

10        after you had rendered a decision?

11             THOMAS SAYERS:  Okay.

12             JOHN GALCZYNSKI:  I'm asking you does

13        that happen?

14             THOMAS SAYERS:  No, uh I don't understand

15        the question --

16             HEARING OFFICER:  I don't understand the

17        question either.

18             JOHN GALCZYNSKI:  Okay, the question is,

19        um does anybody within management change

20        materially the schedules after you issue a

21        schedule?

22             KELLY CHARLES-COLLINS:  Objection the

23        form of the question, materially?

24             HEARING OFFICER:  Um I don't --

25             KELLY CHARLES-COLLINS:  I don't think
```

1       that's in --

2               JOHN GALCZYNSKI:  Okay.

3               HEARING OFFICER:  I don't understand the

4       question is the problem --

5               JOHN GALCZYNSKI:  The question is did

6       anybody go behind Mr. Sayers and change the

7       schedule without his knowledge of

8       authorization who is in a managerial function?

9               KELLY CHARLES-COLLINS:  Objection facts

10      not in evidence.

11              HEARING OFFICER:  And I'm -- I'm

12      sustaining it because there has been no

13      testimony to that.  And when you get -- you

14      can move on and get your, um --

15              JOHN GALCZYNSKI:  And then, I'm going to

16      request at this time to be able to call

17      Mr. Sayers back after I have testimony --

18              HEARING OFFICER:  You can -- you can, you

19      have the right to do that, sir, no problem,

20      any other questions?

21              JOHN GALCZYNSKI:  Yes, um I have here a

22      summary of your question and answer in front

23      of, um Patty Simmons.  And this is --

24              HEARING OFFICER:  What is that, sir, is

25      this the --

1            JOHN GALCZYNSKI:  This is the discussion

2       -- I'm getting into the specifics --

3            HEARING OFFICER:  Okay, what was, uh is

4       this, uh transcript from the previous hearing?

5            JOHN GALCZYNSKI:  No, this is an email

6       which was -- the emails were subpoenaed from

7       Publix Supermarkets relating to, uh

8       Tom Sayers issuing to Susan Says relating to

9       a, um notation of the discussion between

10      Tom Sayers and Amy Barnes witnessed by

11      Patty Simmons.

12           HEARING OFFICER:  I have the email here

13      which email are you referring to?

14           JOHN GALCZYNSKI:  The date of the email

15      is March 8th, 2011 at 11:00 a.m. --

16           KELLY CHARLES-COLLINS:  That's the date

17      of the email --

18           JOHN GALCZYNSKI:  Okay, that was the date

19      of one email from you.

20           KELLY CHARLES-COLLINS:  No, that is not

21      the date of the email --

22           JOHN GALCZYNSKI:  Okay.

23           KELLY CHARLES-COLLINS:  -- the date of

24      the email is right here.

25           JOHN GALCZYNSKI:  Okay, if the date is

```
1              Sunday, May 30th, 2010, 9:34 p.m.
2                   HEARING OFFICER:  Is this the email --
3                   KELLY CHARLES-COLLINS:  No, you had it, I
4              can find it for you.
5                   HEARING OFFICER:  Okay, go ahead, ma'am.
6                   KELLY CHARLES-COLLINS:  Okay.
7                   HEARING OFFICER:  What is this email,
8              sir?
9                   JOHN GALCZYNSKI:  Uh this email is an
10             email, uh to Tom Sayers according to this and
11             subject is Amy Barnes and it says to
12             Susan Says and it says to Kelly -- it looks
13             like it's a forwarded email.
14                  HEARING OFFICER:  Okay.
15                  AMY E. BARNES:  So, I can't tell what the
16             earlier email was specifically because it
17             doesn't -- it just indicates the date of this
18             discussion it's not --
19                  HEARING OFFICER:  Okay, what's your --
20                  JOHN GALCZYNSKI:  Okay, my question is,
21             um the, um discussion and the trigger of
22             Ms. Barnes requesting a transfer.  And I first
23             want to introduce this into evidence, so --
24                  HEARING OFFICER:  Any objection, um --
25                  KELLY CHARLES-COLLINS:  I'm going to
```

```
 1          object it's hearsay.  You have the people here
 2          you can ask questions about the meeting.  Uh
 3          Mr. Sayers was present, Ms. Simmons was
 4          present and Ms. Barnes was present you can ask
 5          them questions.
 6              JOHN GALCZYNSKI:  Okay.
 7              KELLY CHARLES-COLLINS:  Otherwise the
 8          document is --
 9              HEARING OFFICER:  I want to enter the
10          document, the email in the record I believe
11          it's a business record.  I am going to enter
12          the document into the record.
13              Um I've noted your objection, ma'am, but
14          I am going to enter the document into the
15          record.  Uh it will be entered into the record
16          as Claimant's Packet Exhibit 2, an email from
17          May 30th, 2010, next question, sir.
18              JOHN GALCZYNSKI:  Okay, in this, um
19          discussion, this three party, uh calling in
20          Ms. Patty Sayers as a witness, you state here
21          and I want to make sure this is correct, that
22          you would not do a transfer unless it was due
23          to a mileage issue, is that correct?
24              THOMAS SAYERS:  I give an example of why
25          we would do a transfer.
```

```
1              JOHN GALCZYNSKI:  Okay, is that
2         definitive?
3              THOMAS SAYERS:  No.
4              JOHN GALCZYNSKI:  Okay, can you
5         elaborate?
6              KELLY CHARLES-COLLINS:  Objection,
7         elaborate on what?
8              HEARING OFFICER:  What was your --
9              JOHN GALCZYNSKI:  I'm trying to get him
10        to elaborate on why he would not do a
11        transfer.  It was indicated earlier by him
12        that he would not.  I'm simply trying to cover
13        the reasons for him so doing.
14             KELLY CHARLES-COLLINS:  Objection --
15             HEARING OFFICER:  Okay, sir, I'm moving
16        on to the next question.
17             JOHN GALCZYNSKI:  Okay.
18             HEARING OFFICER:  I'm sustaining that
19        objection we're going to move on, what's your
20        next question, sir?
21             JOHN GALCZYNSKI:  Okay, my next question
22        is this, um why was Patty Simmons called in to
23        this meeting between you and Amy?
24             THOMAS SAYERS:  Because Patty brought to
25        my attention that Amy was upset and I said,
```

113

```
1          well, Amy did not bring it to my attention she
2          was upset.  I said, well, the three of us will
3          sit down and talk about it.
4               JOHN GALCZYNSKI:  Okay, how upset was
5          she, could you visibly see her being upset?
6               KELLY CHARLES-COLLINS:  Objection, asked
7          and answered.
8               HEARING OFFICER:  Okay, I'm going to --
9          you know, it's -- I'm going to -- it's
10         10 'til 3:00 now, sir --
11              JOHN GALCZYNSKI:  Okay.
12              HEARING OFFICER:  -- we've got to, uh
13         I've got to note something before I let you
14         continue on with these questions.  How many
15         other questions do you have for this witness?
16              JOHN GALCZYNSKI:  Again, I'm going to
17         give you the same answer --
18              HEARING OFFICER:  Okay, you --
19              JOHN GALCZYNSKI:  -- I'm going to --
20              HEARING OFFICER:  -- you're not going to
21         give me an answer is what you're saying?
22              JOHN GALCZYNSKI:  What -- this is -- I'll
23         try to give you an answer to the best of my
24         ability.  I am simply trying to cover the --
25         the, um the reasoning that, um or the
```

114

```
 1              circumstances under which, uh Ms. Barnes felt
 2              that she was being pushed out of Publix by
 3              Mr. Sayers, that's it --
 4                   HEARING OFFICER:  Okay, all right, well,
 5              you can direct that to Ms. Barnes when you get
 6              her testimony and when we get her testimony.
 7              You can call him back for rebuttal you can.
 8                   But right now do you have any other
 9              questions regarding his previously testimony
10              you want to ask at this time?
11                   JOHN GALCZYNSKI:  Uh if you could, uh
12              provide me one minute I will look at this and
13              I will answer that question.  Um yes, I have a
14              few more questions relating --
15                   HEARING OFFICER:  Go ahead.
16                   JOHN GALCZYNSKI:  -- specifically to his
17              testimony that he initially began with.
18                   HEARING OFFICER:  Go ahead.
19                   JOHN GALCZYNSKI:  Um on direct you had
20              stated that, um in response to Ms. Collins'
21              question that there was no fear, anger,
22              humiliation or embarrassment sustained by the
23              Claimant, Amy Barnes in your discussion?
24                   KELLY CHARLES-COLLINS:  Objection,
25              misstates the evidence --
```

```
 1                    THOMAS SAYERS:  No.

 2                    JOHN GALCZYNSKI:  Did you ever, um see

 3              that Ms. Barnes was, um upset in any way, um

 4              relating to how she perceived you dealing with

 5              her?

 6                    KELLY CHARLES-COLLINS:  Object, answered.

 7                    JOHN GALCZYNSKI:  Okay, um --

 8                    HEARING OFFICER:  No, I'm going to rule

 9              on your objection, ma'am.  I'm going to allow

10              the question because at this point I'm not

11              sure it has been answered.  So, I'm going to

12              make sure it's on the record, go ahead.

13                    THOMAS SAYERS:  Repeat the question?

14                    JOHN GALCZYNSKI:  Yes, um did you have

15              any, um experience where you could visibly see

16              Ms. Amy Barnes, the Claimant, uh having a, um

17              an emotional reaction that -- that, uh was not

18              typical -- I don't know how to phrase this

19              exactly it's, uh --

20                    THOMAS SAYERS:  That's enough I can

21              answer it.

22                    JOHN GALCZYNSKI:  Okay.

23                    KELLY CHARLES-COLLINS:  No, you --

24                    HEARING OFFICER:  You need to properly

25              form the question, sir.
```

117

```
1              JOHN GALCZYNSKI:  Okay, my question is

2        did you see Ms. Barnes' behavior in any of

3        your encounters with Ms. Barnes that -- that

4        indicated that she appeared humiliated, hurt,

5        uh alienated, um any of that?

6              THOMAS SAYERS:  No.

7              JOHN GALCZYNSKI:  How did you hand, uh

8        Ms. Barnes the notes from this, uh discussion

9        between Patty, uh Sayers, yourself and

10       Amy Barnes?

11             THOMAS SAYERS:  What notes?

12             JOHN GALCZYNSKI:  These specific --

13             THOMAS SAYERS:  Um she was on a register

14       and I came back up behind her.

15             JOHN GALCZYNSKI:  Okay, so you came up

16       behind her and --

17             THOMAS SAYERS:  I tapped her on the

18       shoulder if that's what you're referencing to

19       touching her.

20             JOHN GALCZYNSKI:  Did you say anything to

21       her prior to this or you just came up and

22       tapped her behind the -- on the shoulder?

23             THOMAS SAYERS:  I don't recall saying

24       anything.

25             JOHN GALCZYNSKI:  Okay, and, um would you
```

1           say that subsequent to this meeting that, um

2           Ms. Barnes having tendered a request for a

3           transfer, um was taking it personally or felt

4           that, uh somehow you were, um not fair or that

5           -- that, uh there was an alienation?

6               KELLY CHARLES-COLLINS:  Objection, vague

7           and compound.

8               JOHN GALCZYNSKI:  Okay.

9               HEARING OFFICER:  I believe it was

10          compound, um --

11              JOHN GALCZYNSKI:  Sorry.

12              HEARING OFFICER:  One question at a time,

13          sir.

14              JOHN GALCZYNSKI:  Okay, did you feel

15          after this, uh meeting between Patty Sayers,

16          yourself and Amy Barnes that, uh Amy Barnes

17          evidenced, um alienation?

18              KELLY CHARLES-COLLINS:  Objection, what

19          meeting?

20              JOHN GALCZYNSKI:  It's highlighted at

21          this one.

22              HEARING OFFICER:  Can you be specific on

23          which meeting you're referring to?

24              JOHN GALCZYNSKI:  Yes, the one that we

25          just discussed.  Um Sunday, May 30th,

```
1          9:34 p.m. is that correct?  That's what is on
2          here.
3              THOMAS SAYERS:  I believe it was Saturday
4          the day of the incident.
5              JOHN GALCZYNSKI:  Okay, Saturday that's
6          what I'm referring to, Saturday.
7              HEARING OFFICER:  Okay, now, ask the
8          question, so --
9              JOHN GALCZYNSKI:  My question is did you
10         perceive Amy Barnes as being alienated
11         subsequent to that meeting?
12             KELLY CHARLES-COLLINS:  Objection asked
13         and answered.
14             HEARING OFFICER:  I'm not sure it has
15         been asked and answered, ma'am.  I'm going to
16         allow the answer, go ahead, sir.
17             THOMAS SAYERS:  No.
18             JOHN GALCZYNSKI:  Did you see at any
19         point that she felt hurt, emotionally?
20             THOMAS SAYERS:  Before that meeting?
21             JOHN GALCZYNSKI:  No, after this meeting.
22             THOMAS SAYERS:  I had stated earlier that
23         she was crying, Patty noticed she was crying.
24         Patty brought it to my attention.
25             She came into my office a couple of hours
```

120

1          later and she was not upset at that time.  As

2          the conversation occurred between her and I --

3          I could see her getting upset.

4              JOHN GALCZYNSKI:  Okay, and did you see,

5          um behaviorally anything that, um that in the

6          six months since then, that indicated she

7          wanted to not transfer?

8              THOMAS SAYERS:  No, she never brought it

9          back up.

10             JOHN GALCZYNSKI:  Okay, I'm done with my

11         questions.

12             HEARING OFFICER:  Okay, at this point,

13         does anyone need a bathroom break?

14             JOHN GALCZYNSKI:  Bathroom break?

15             HEARING OFFICER:  Okay, because I need

16         one to be honest with you, so we're going to

17         take one.

18             KELLY CHARLES-COLLINS:  Okay.

19             HEARING OFFICER:  Uh we're going to take

20         a five minute bathroom break.  And then, I

21         will call -- call Mr. Kidd in and begin to get

22         his testimony.

23             Um so you can go back to the lobby and

24         you can go out to the lobby and use the

25         restroom and they'll let you back in or I'll

121

    1              come out and get you either way, I'm sorry?

    2                   INTERPRETER CELIO BEST:  What time?

    3                   HEARING OFFICER:  Uh about five minutes,

    4              four or five minutes just as quick as

    5              possible.

    6                   KELLY CHARLES-COLLINS:  Do you want me to

    7              get Kevin?

    8                   HEARING OFFICER:  No, I've got to go out

    9              and get him.

   10                   KELLY CHARLES-COLLINS:  Okay.

   11                   HEARING OFFICER:  So, if you go to the

   12              restroom I'll come out and get you as well.

   13              They probably won't let you come back by

   14              yourself.  If they let you I've got to go get

   15              Mr. Kidd, so -- so you can go back to the

   16              lobby.

   17                   KELLY CHARLES-COLLINS:  Okay.

   18                   HEARING OFFICER:  Okay.

   19                   INTERPRETER CELIO BEST:  I'll use the

   20              bathroom.

   21                   KELLY CHARLES-COLLINS:  That's funny

   22              because we're thinking that --

   23                   INTERPRETER CELIO BEST:  Oh okay, that's

   24              fine.

   25                   HEARING OFFICER:  And while I'm out of

                                   122

```
 1              the room please don't discuss this case --
 2              please don't discuss the case --
 3                   INTERPRETER CELIO BEST:  I understand.
 4                   HEARING OFFICER:  Okay, the lobby is
 5              right out there that way where y'all came in,
 6              yeah.  Come on in we're going on record the
 7              time is now --
 8                   (gap in recording 124:35-124:37)
 9                   HEARING OFFICER:  -- y'all come in and
10              have a seat.  Okay, sir, your name for the
11              record?
12                   KEVIN KIDD:  Kevin Kidd.
13                   HEARING OFFICER:  And how do you spell
14              your last name?
15                   KEVIN KIDD:  K-I-D-D.
16                   HEARING OFFICER:  And your title with the
17              company?
18                   KEVIN KIDD:  Assistant Store Manager.
19                   HEARING OFFICER:  And do you swear or
20              affirm that the testimony you're about to give
21              is the truth, the whole truth and nothing but
22              the truth so help you God?
23                   KEVIN KIDD:  I do.
24                   HEARING OFFICER:  I know that I'm
25              recording the hearing, but I have to ask you
```

123

1            if you're recording the hearing?

2                 KEVIN KIDD:  No, I'm not.

3                 HEARING OFFICER:  Okay -- okay, Mr. Kidd,

4            regarding the letter of resignation, did --

5            let me see if I've got a copy here I've got to

6            find -- find what I did with it now.  This

7            document right here.

8                 KEVIN KIDD:  Uh-hmm.

9                 HEARING OFFICER:  Did you instruct

10           Ms. Barnes to write that?

11                KEVIN KIDD:  I advised her that she,

12           yeah, to write a letter -- she wanted to put

13           it on -- to make it official put it on -- to

14           document it.

15                HEARING OFFICER:  Did you tell her what

16           to write?

17                KEVIN KIDD:  No, I did not.

18                HEARING OFFICER:  Did you tell her to

19           write what's written there?

20                KEVIN KIDD:  No, I did not, actually, I

21           was not present when she wrote it.

22                HEARING OFFICER:  Did --

23                KEVIN KIDD:  I walked away.

24                HEARING OFFICER:  -- did you -- did you

25           pressure her in any way to resign?

124

1           KEVIN KIDD:  No, I did not.

2           HEARING OFFICER:  Did she just walk up to

3      you and tell you she was resigning?

4           KEVIN KIDD:  Yes, actually, I was

5      standing at customer service, I was actually

6      in the store they paged me to customer

7      service.

8           Um Amy then, approached me and told me

9      that she wanted to resign.  I told her, you

10     know, if possible could she document it.

11          Um and I will walk -- because I remember

12     Tom I saw Tom at a distance and I went to tell

13     Tom that Amy was here to resign.

14          HEARING OFFICER:  Anything else you want

15     to tell me about?

16          KEVIN KIDD:  No.

17          HEARING OFFICER:  Okay, Ms. Collins, you

18     want to go ahead and ask your questions,

19     Ms. Collins --

20          KELLY CHARLES-COLLINS:  Yes, um was there

21     an incident, um that Ms. Barnes notified you

22     about regarding reading an email on

23     Tom Sayers' desk?

24          KEVIN KIDD:  Yes.

25          KELLY CHARLES-COLLINS:  Tell me about

```
 1          that?
 2              KEVIN KIDD:  Um she approached me about
 3          the fact that she read an email that said
 4          that, um we were going to demote her to --
 5          basically she said she was going to demoted,
 6          um and she wanted to know why because she felt
 7          that she had been doing her job.
 8              Um I told her that I was not aware of the
 9          situation, what she was speaking about because
10          I was -- that was the first I had heard of it.
11          Um but I told her I would see what I could
12          find out and --
13              KELLY CHARLES-COLLINS:  And was that the
14          only conversation you had with her about that
15          email?
16              KEVIN KIDD:  No, there was a secondary
17          conversation about that email, um when Laura
18          came to work I sat down with Amy and addressed
19          the situation of her reading, um confidential
20          documentation in the Store Manager's desk.
21              The first conversation I asked her where
22          did she see this email?  So, I decided to have
23          a conversation about that you shouldn't go
24          around reading information that was not for
25          you.
```

126

1           Um during that, uh situation Ms. Barnes

2       got upset, used words of profanity.  And I

3       told her that she needed to go home.

4           KELLY CHARLES-COLLINS:  What did she tell

5       you?

6           KEVIN KIDD:  Her exact words?

7           KELLY CHARLES-COLLINS:  Uh-hmm.

8           KEVIN KIDD:  I think it was you're full

9       of shit.

10          KELLY CHARLES-COLLINS:  That was in

11      reference to you asking her about reading the

12      email on the desk?

13          KEVIN KIDD:  That is correct.

14          KELLY CHARLES-COLLINS:  Um are associates

15      supposed to read anything that is on the

16      Store Manager's desk?

17          KEVIN KIDD:  No.

18          JOHN GALCZYNSKI:  Objection.

19          HEARING OFFICER:  What's your objection,

20      sir?

21          JOHN GALCZYNSKI:  My objection is that,

22      um testimony earlier indicated that she was

23      never given notice.

24          If you look at the policy handbook

25      entered into evidence there is nothing to that

127

1              affect.

2                   HEARING OFFICER:  Okay, I'm going to

3              allow the question, I'll note your objection

4              for the record.

5                   JOHN GALCZYNSKI:  Certainly.

6                   HEARING OFFICER:  Any other questions,

7              ma'am?

8                   KELLY CHARLES-COLLINS:  Is it common

9              sense that you're not supposed to read

10             anything that's on the Store Manager's desk

11             that's not addressed to you?

12                  KEVIN KIDD:  Yes, and there might even,

13             actually, be policy I really don't know.  But

14             I know there is confidentiality policies and,

15             uh -- it's not your office it's not your

16             paperwork.  It's common knowledge.  Because if

17             you were saw an Employee's file sitting

18             around --

19                  KELLY CHARLES-COLLINS:  Was there an

20             incident, um in later in October where you and

21             Patty Simmons had to speak to Ms. Barnes, uh

22             about a customer complaint?

23                  KEVIN KIDD:  Yes.

24                  KELLY CHARLES-COLLINS:  Um how -- without

25             saying what the customer said can you tell us

128

1        about the discussion you had with Ms. Barnes?

2              KEVIN KIDD:  Yes, um we sat down,

3        basically, we spoke about her role as a

4        Cashier and improper and proper conversations

5        we should have about customers and not judging

6        their shopping habits.

7              JOHN GALCZYNSKI:  I'm going to object I

8        don't know when this is can you --

9              HEARING OFFICER:  You and Ms. Barnes had

10       this conversation?

11             KEVIN KIDD:  Yes, well, it was, yes, me

12       and, Ms. Barnes and Patty Simmons.

13             KELLY CHARLES-COLLINS:  Did this happen

14       on or about October 22nd?

15             KEVIN KIDD:  Yes.

16             KELLY CHARLES-COLLINS:  And was this

17       asked or did Ms. Barnes had already been

18       reclassified to the position of Cashier?

19             KEVIN KIDD:  I believe so.

20             KELLY CHARLES-COLLINS:  Um did she --

21       what did she say about the conversation, what

22       did Ms. Barnes say about the conversation she

23       had?

24             KEVIN KIDD:  From what I remember is she,

25       basically, she really didn't know what she did

129

1          wrong.

2               I can't remember, I think the discussion

3          I had with Patty afterwards was like that's

4          just not -- that's not really good that she

5          doesn't know what she did wrong.  The customer

6          was offended by the situation.  Not the

7          customer, but the other customer was offended.

8               KELLY CHARLES-COLLINS:  And was this the

9          first time that Ms. Barnes had been spoken to

10         about having these types of inappropriate

11         conversations?

12              KEVIN KIDD:  No, it was not.

13              HEARING OFFICER:  Sir, any questions?

14              JOHN GALCZYNSKI:  Yes, um you indicated

15         that there was several occasions, is that

16         correct, that, uh Ms. Barnes was pulled aside

17         for, uh coaching --

18              KELLY CHARLES-COLLINS:  Objection,

19         that's --

20              HEARING OFFICER:  I don't --

21              JOHN GALCZYNSKI:  Did you indicate -- are

22         you aware that Ms. Barnes was pulled aside for

23         coaching?

24              KEVIN KIDD:  Yes.

25              JOHN GALCZYNSKI:  Did you pull aside

130

```
1              Ms. Barnes for coaching?

2                   KEVIN KIDD:  Yes.

3                   JOHN GALCZYNSKI:  Were you aware, um did

4              you at any point, uh prior to this incident

5              with the email on the desk notify Ms. Barnes

6              not to read correspondence?

7                   KEVIN KIDD:  Did I personally --

8                   JOHN GALCZYNSKI:  Yes, you personally?

9                   KEVIN KIDD:  No.

10                  JOHN GALCZYNSKI:  Okay, and, um do you

11             know are you familiar with Pubilx policy

12             relating to, uh confidentiality?

13                  KEVIN KIDD:  Am I familiar with it?

14                  JOHN GALCZYNSKI:  Yes.

15                  KEVIN KIDD:  I would say familiar, if you

16             read it to me I would --

17                  JOHN GALCZYNSKI:  Okay, and, um is this

18             policy evidenced by this, uh document which

19             has been introduced into evidence?

20                  KELLY CHARLES-COLLINS:  Objection, if you

21             have a specific, uh policy you'd like --

22                  HEARING OFFICER:  Okay, I want to rule on

23             the objection, your objection, ma'am?

24                  KELLY CHARLES-COLLINS:  That if he has a

25             specific policy he can look at it and I can
```

1              just give him the whole --

2                   HEARING OFFICER:  Okay, is there specific

3              you want him to look at --

4                   JOHN GALCZYNSKI:  Yes, my first question

5              is, one, this document -- is this the

6              controlling document?

7                   KELLY CHARLES-COLLINS:  Objection, it

8              calls for speculation, controlling what?

9                   JOHN GALCZYNSKI:  Controlling Publix

10             policy, this document?

11                  KELLY CHARLES-COLLINS:  I'm not

12             testifying.

13                  HEARING OFFICER:  Okay -- okay, your

14             question is the Employee handbook the

15             controlling document that's a vague question.

16                  JOHN GALCZYNSKI:  Okay, what do you use

17             as a standard for behavior in dealing with

18             associates at Publix related to their scope

19             function, uh activities, et cetera?

20                  KEVIN KIDD:  Okay, we have a rule of

21             acceptable conduct.

22                  JOHN GALCZYNSKI:  Which is where?

23                  KEVIN KIDD:  Associates should have a

24             copy of it --

25                  JOHN GALCZYNSKI:  Okay.

132

1           KEVIN KIDD:  -- in the associate

2     handbook.  There is also an MRL which is

3     Managers retail library.

4           JOHN GALCZYNSKI:  Okay, and, um this

5     retail library that you eluded to is outside

6     of the scope of this --

7           KEVIN KIDD:  That is correct.

8           JOHN GALCZYNSKI:  Okay, um there are a

9     number of, uh categories in this, uh associate

10    handbook --

11          HEARING OFFICER:  What's the question,

12    sir?

13          KEVIN KIDD:  Yes.

14          JOHN GALCZYNSKI:  I was getting to the

15    question.  And I want to -- I want to cover,

16    um had you, uh in -- in discussing or -- or,

17    uh having a discussion with, uh Ms. Barnes

18    after she was, uh reclassified where she said

19    you are full of shit.  Um what happened, what

20    did you say to Ms. Barnes prior to her making

21    that assertion?

22          KEVIN KIDD:  What do you mean?

23          JOHN GALCZYNSKI:  What did -- if you made

24    a statement what was the --

25          KEVIN KIDD:  There was a --

133

1          JOHN GALCZYNSKI:  -- what was the

2     statement that you made that Ms. Barnes

3     responded to you are full of shit?

4          KEVIN KIDD:  Oh --

5          JOHN GALCZYNSKI:  So, did you think this

6     had any significance?

7          KELLY CHARLES-COLLINS:  Objection vague.

8          HEARING OFFICER:  Okay, all right, you're

9     -- you're questioning, you want to establish

10     that she was provoked and used profanity to --

11          JOHN GALCZYNSKI:  That's correct.

12          HEARING OFFICER:  -- so therefore

13     profanity was okay?  That's what you're trying

14     to state, is that correct, sir?

15          JOHN GALCZYNSKI:  What I'm saying is she

16     complained about job conditions and she was

17     provoked, yes.

18          HEARING OFFICER:  Okay, that has not been

19     established.  There has been no testimony on

20     that.  You have the right to ask your client,

21     Ms. Barnes about that when you get her

22     testimony and the witnesses you plan to call.

23          JOHN GALCZYNSKI:  Okay.

24          HEARING OFFICER:  But at this point it's

25     not relevant and we're going to move on.

134

1           JOHN GALCZYNSKI:  Okay, um did you see

2      Ms. Barnes in any way as disabled?

3           KEVIN KIDD:  I see Ms. Barnes in

4      any way

5           JOHN GALCZYNSKI:  Yes, does she have a

6      disability?

7           KELLY CHARLES-COLLINS:  Objection, calls

8      for speculation.

9           HEARING OFFICER:  Okay, I'm going to

10     allow the question.  Can you -- if she was one

11     of your Employees did you -- did you think she

12     was disabled as to a disability?

13          KEVIN KIDD:  No, because we had to make

14     no reasonable accommodations for her to

15     complete her job tasks.  So, I saw no

16     disability as to her doing her job.

17          HEARING OFFICER:  Next question, sir.

18          JOHN GALCZYNSKI:  Okay, next question, um

19     are you aware that Ms. Barnes is hard of

20     hearing?

21          KEVIN KIDD:  Yes, she mentioned that.

22          JOHN GALCZYNSKI:  Okay, did other people

23     mention this?

24          KEVIN KIDD:  She mentioned it, I don't

25     think it was a topic of discussion.

 1              JOHN GALCZYNSKI:  Could you see in
 2         talking to her that you had to talk to her
 3         face to face, did -- could you relate to this
 4         as actual rather than imagined?
 5              KELLY CHARLES-COLLINS:  Objection, calls
 6         for speculation.
 7              HEARING OFFICER:  And I don't -- I think
 8         the question is -- is -- is -- is -- it
 9         doesn't make any sense.
10              JOHN GALCZYNSKI:  Okay, what I'm asking
11         is, um her behavior would it indicate in fact
12         that was correct, that she had a hearing
13         issue?
14              THOMAS SAYERS:  She had mentioned to me
15         that she had a hearing issue.  She had asked
16         me when I speak to her to look at her which I
17         did.
18              But as to her job performance which is
19         what I engage a disability is we had to make
20         no reasonable accommodations.  She did her --
21         she performed her job.
22              So, her disability or I guess limited of
23         hearing or speaking never really became a
24         topic.
25              JOHN GALCZYNSKI:  Had you seen

1              Ms. Barnes use an asthma inhaler?

2                   KEVIN KIDD:  Uh no.

3                   JOHN GALCZYNSKI:  Did you -- are you

4              aware if she has asthma?

5                   (gap in recording 137:10-137:18)

6                   JOHN GALCZYNSKI:  Um were you aware of

7              any transfers that went through prior to, um,

8              uh the suspension of Ms. Barnes?

9                   KELLY CHARLES-COLLINS:  Objection it --

10                  HEARING OFFICER:  Okay, uh --

11                  JOHN GALCZYNSKI:  Okay, what I'm asking

12             is there was an -- are you aware of an email

13             that indicates that a transfer had gone

14             through?

15                  KEVIN KIDD:  I was aware that Amy --

16             there was an email of Amy seeking a transfer.

17                  JOHN GALCZYNSKI:  Were you aware there

18             was an email indicating that a transfer in

19             fact went through?

20                  KEVIN KIDD:  No.

21                  JOHN GALCZYNSKI:  I'd like to call into

22             evidence the email that, uh shows --

23                  HEARING OFFICER:  Was he -- was he copied

24             on the email?

25                  KEVIN KIDD:  Was I a recipient of the

```
 1           email?
 2                KELLY CHARLES-COLLINS:  No.
 3                JOHN GALCZYNSKI:  Um okay, let's get to
 4           that, um as an Assistant Store Manager --
 5                KEVIN KIDD:  Uh-hmm.
 6                JOHN GALCZYNSKI:  -- is it typical by way
 7           of either shift notes or some other
 8           communication that you be informed of the
 9           status?
10                KEVIN KIDD:  Status?
11                JOHN GALCZYNSKI:  If an associate is
12           suspended would you know?
13                KEVIN KIDD:  Uh more than likely, but not
14           always.
15                JOHN GALCZYNSKI:  Would you have an
16           obligation to pull up whose is on duty or what
17           the general roles are of people at that point?
18                KEVIN KIDD:  An obligation, no.
19                JOHN GALCZYNSKI:  So, it's not -- there
20           is no passage of this person is suspended,
21           these people -- none of that?
22                KEVIN KIDD:  No.
23                JOHN GALCZYNSKI:  So, when there is a
24           problem how are you given notice?
25                KEVIN KIDD:  Being brought to my
```

138

1        attention, if it was a Department Manager

2        situation --

3            HEARING OFFICER:  Okay, we're going to

4        have to stop you can't hear over that, it's

5        not going to be heard on the tape.

6            JOHN GALCZYNSKI:  You've got to -- you've

7        got to stop, okay.

8            KEVIN KIDD:  What was the question?

9            JOHN GALCZYNSKI:  Okay, the question is

10       your awareness of, um when there are, um

11       personnel issues or --

12           KEVIN KIDD:  How does it come to my

13       attention?

14           JOHN GALCZYNSKI:  Yes.

15           KEVIN KIDD:  Um usually the situation

16       escalates past the Department Manager.  So,

17       either the Department Manager brings it to my

18       attention or an associate situation.

19           JOHN GALCZYNSKI:  Have you ever been

20       berating towards Ms. Barnes?

21           KEVIN KIDD:  No.

22           JOHN GALCZYNSKI:  Have you asked

23       questions that you wouldn't listen to an

24       answer?

25           KEVIN KIDD:  No, I wouldn't ask a

```
 1              question and not --
 2                   JOHN GALCZYNSKI:  If she ever --
 3                   KELLY CHARLES-COLLINS:  Can you let him
 4              answer --
 5                   HEARING OFFICER:  Yeah, I'm sorry he
 6              needs to finish his answer and not cut him
 7              off.
 8                   JOHN GALCZYNSKI:  Okay, sorry.
 9                   KEVIN KIDD:  I would not ask a question
10              that I didn't want an answer to, so no.
11                   JOHN GALCZYNSKI:  And you make
12              assumptions when you hear from one party to
13              another party as to the correctness or
14              validity of whatever it is that they have to
15              say prior to you confronting an associate?
16                   KEVIN KIDD:  No.
17                   JOHN GALCZYNSKI:  So, how do you handle
18              that?
19                   KELLY CHARLES-COLLINS:  Objection,
20              relevance.
21                   JOHN GALCZYNSKI:  How do you handle it
22              with Ms. Barnes?
23                   KELLY CHARLES-COLLINS:  Objection,
24              relevance.
25                   HEARING OFFICER:  Okay, how is this
```

140

```
 1          question relevant to --

 2              JOHN GALCZYNSKI:  Where I'm trying to get

 3          at is when Ms. Barnes made the comment that,

 4          uh Kevin Kidd, uh the full of shit remark, he

 5          -- what -- what pushed her?  I'm trying to get

 6          at specifically what he did to push her to be

 7          so --

 8              HEARING OFFICER:  Ask him what he --

 9          then, ask him what he did before --

10              JOHN GALCZYNSKI:  Okay, that's what I'm

11          trying to --

12              HEARING OFFICER:  Before she made the

13          comment that you were full of S-H-I-T.

14              KEVIN KIDD:  Uh-hmm.

15              HEARING OFFICER:  What comment did you

16          make to her --

17              KEVIN KIDD:  I don't recall it being a

18          specific comment.  We were discussing her

19          looking on the desk and she kept switching

20          topics.

21              And I think it came out of frustration

22          because she's talking about one thing and I

23          kept redirecting her back to this is -- it's

24          unacceptable for you to go through the

25          paperwork on a Store Manager's desk.
```

```
1              I didn't make any specific comment, I did
2         not -- you can ask her I did not belittle her
3         or -- she just got upset because she didn't
4         agree with what I was telling her and told me,
5         you're full of S-H-I-T --
6              JOHN GALCZYNSKI:  Did you write her up
7         for that?
8              KEVIN KIDD:  No, I sent her home.
9              JOHN GALCZYNSKI:  You sent her home?
10             KEVIN KIDD:  Yes.
11             JOHN GALCZYNSKI:  And you admitted
12        earlier that she had no prior knowledge
13        relating to reading of documents --
14             KEVIN KIDD:  Objection, misstating of the
15        facts.
16             HEARING OFFICER:  Yeah, I don't know if
17        he said -- let the whole question come out
18        before I make a ruling on it, go ahead, sir.
19             JOHN GALCZYNSKI:  Okay, um I'm going to
20        reiterate your earlier question at the risk of
21        being, uh going through the same objection.
22             Um did you, um did you notify Ms. Barnes
23        prior to this incident of there is a no
24        reading of managerial documentation?
25             KELLY CHARLES-COLLINS:  Objection, asked
```

```
 1              and answered.
 2                   JOHN GALCZYNSKI:  That's what I said, I'm
 3              going back to that.
 4                   HEARING OFFICER:  Okay, I'm going to
 5              allow the question, objection overruled.
 6                   KEVIN KIDD:  From what I remember what
 7              you asked me was, uh did I personally tell her
 8              she was not allowed to read the
 9              Store Manager's desk -- documents on the
10              Store Manager's desk before this --
11                   JOHN GALCZYNSKI:  Yes.
12                   KEVIN KIDD:  -- I don't go around and
13              personally tell everyone not to read --
14                   JOHN GALCZYNSKI:  Okay, so you
15              essentially suspended her for that period
16              subsequent to your conversation knowing that
17              she had no knowledge of this, is that correct?
18                   KELLY CHARLES-COLLINS:  Objection --
19                   HEARING OFFICER:  Okay, I sustain the
20              objection because it misstates what he said.
21                   JOHN GALCZYNSKI:  Okay.
22                   HEARING OFFICER:  Okay.
23                   JOHN GALCZYNSKI:  Um --
24                   KEVIN KIDD:  Can I clarify?
25                   KELLY CHARLES-COLLINS:  No.
```

143

```
1              HEARING OFFICER:  Next question, sir.
2              JOHN GALCZYNSKI:  My next question is, um
3         why then, did you suspend her --
4              KELLY CHARLES-COLLINS:  Objection,
5         misstates the facts.
6              HEARING OFFICER:  No, uh --
7              JOHN GALCZYNSKI:  How did I make a
8         misstatement of fact?
9              HEARING OFFICER:  Okay, uh --
10             KELLY CHARLES-COLLINS:  Because he did
11        not suspend her he never testified to that.
12             HEARING OFFICER:  Okay, were you involved
13        in the suspension?
14             KEVIN KIDD:  No, I sent her home for her
15        to come back and talk with the Store Manager.
16        I sent her home because of the use of
17        profanity, not for looking --
18             HEARING OFFICER:  No, you sent her home -
19        - did she come back the next day?
20             KEVIN KIDD:  I really don't recall, the
21        documents will probably clarify when she comes
22        back.
23             HEARING OFFICER:  Okay, what I'm asking
24        you regarding the suspension.
25             KEVIN KIDD:  Uh-hmm.
```

144

1        HEARING OFFICER:  She was administered

2        were you involved in?

3        KEVIN KIDD:  No, I did not administer

4        the --

5        HEARING OFFICER:  Okay, then we're going

6        to move on --

7        JOHN GALCZYNSKI:  Okay, um performance

8        wise what -- what issues did you have with

9        Ms. Barnes aside from what you've just

10       covered?

11       KEVIN KIDD:  I'd have to look at her

12       documentation --

13       JOHN GALCZYNSKI:  So, nothing essentially

14       that -- that rules your mind over --

15       KEVIN KIDD:  Right, I know we had -- I

16       don't want to misstate, but I know we had

17       customer complaint issues.

18       JOHN GALCZYNSKI:  You don't know that?

19       KEVIN KIDD:  I have the documentation I

20       could go through what exactly -- I deal with

21       hundreds of Employees.

22       JOHN GALCZYNSKI:  I understand that.

23       HEARING OFFICER:  Okay, wait, uh what

24       you're saying is you don't have any specifics,

25       is that correct?

1       KEVIN KIDD:  I know, but I don't -- I

2   mean she was counseled for, uh I mean she was

3   coached for the Capri Suns.  I know of her

4   being counseled by Tom, you know, uh the

5   situations with the customers.

6       Um more than one occasion I know she was

7   either counseled, coached or both with

8   profanity to another Manager.

9       If I have the documentation I could -- I

10  just don't want to speak of something I don't

11  speak of something I don't --

12      HEARING OFFICER:  Okay, any other

13  questions?

14      JOHN GALCZYNSKI:  Yes, um you indicated

15  specific incidents this Capri Suns.  Perhaps

16  you could, uh elaborate on this incident

17  specifically to the best of your recollection

18  what was the complaint?

19      KEVIN KIDD:  The complaint was -- was a

20  customer you said she was very uncomfortable

21  because --

22      HEARING OFFICER:  Okay, he's testifying

23  to what the customer complained as I told you,

24  uh told Ms. Collins that --

25      JOHN GALCZYNSKI:  Okay, let me --

146

1            HEARING OFFICER:  -- it's hearsay.  I

2       can't make a Decision on it, so it's a waste

3       of time to go into.

4            JOHN GALCZYNSKI:  All right, what I'm

5       asking is what did she say to her, Amy Barnes

6       the Claimant after this incident with the

7       customer?

8            HEARING OFFICER:  Go ahead, sir.

9            KEVIN KIDD:  You asked me what happened

10      to --

11           HEARING OFFICER:  Just answer it again --

12           KEVIN KIDD:  Answer it again, okay, um we

13      brought Amy Barnes into the office and told

14      her we had a customer complaint, um --

15           JOHN GALCZYNSKI:  What was the complaint?

16           KELLY CHARLES-COLLINS:  Objection he --

17           HEARING OFFICER:  I mean, uh if it comes

18      -- he testified to what the customer told him

19      the customer isn't here as a witness it's

20      hearsay.

21           JOHN GALCZYNSKI:  All right, um what

22      happened?

23           KELLY CHARLES-COLLINS:  Question asked

24      and answered.

25           HEARING OFFICER:  I'm going to say I'm

147

1        not going to allow that question because it's

2        vague.

3            JOHN GALCZYNSKI:  Okay, in response to

4        whatever complaint this was what did you say

5        or do or what rule did you accuse Ms. Barnes

6        of breaking?

7            KEVIN KIDD:  It was a coaching session.

8        I didn't accuse her of breaking any rules.

9        What I did was I told her that what I was

10       informed that the customer felt very

11       uncomfortable because of a remark that they

12       felt it not appropriate trying to make

13       purchases.

14           Ms. Barnes said she was just trying to

15       bring information to her and help her.  I told

16       her that's not our role, it was to check the

17       customers out, tell them have a good day and

18       ask them if we can help them find anything

19       else.  That we should limit conversations to

20       the scope of what asked.

21           JOHN GALCZYNSKI:  When did you become

22       aware that Ms. Barnes had filed for or

23       requested, uh a transfer?

24           KEVIN KIDD:  Not at all.

25           JOHN GALCZYNSKI:  Not at all.

148

```
1              KEVIN KIDD:  If I had the documentation I
2         could testify to the dates, but I don't --
3              JOHN GALCZYNSKI:  Um did you at any time
4         withhold knowledge during this, uh end of
5         October period that in effect a transfer had,
6         um been approved and Ms. Barnes was not to be
7         notified?
8              KELLY CHARLES-COLLINS:  Objection, asked
9         and answered.
10             KEVIN KIDD:  Aware of the transfer went
11        through?
12             JOHN GALCZYNSKI:  Okay --
13             HEARING OFFICER:  Okay.
14             JOHN GALCZYNSKI:  -- I would like to
15        introduce that email, um relating to the fact
16        that a transfer had gone through --
17             HEARING OFFICER:  Okay, yeah, but was he
18        aware of it?  That's why I asked you before --
19             JOHN GALCZYNSKI:  Okay, are you cc'd for
20        Store Manager on emails relating to transfers?
21             KEVIN KIDD:  No.
22             KELLY CHARLES-COLLINS:  You have the
23        email -- the email is in record, so.
24             HEARING OFFICER:  And he's saying it's
25        not so go to the next question.
```

149

1               JOHN GALCZYNSKI:  Okay, so were you in

2        any point notified by Mr. Sayers or any other

3        associate or management member that a, uh

4        transfer had in fact gone through and you were

5        aware of it at that time?

6             (gap in recording 147:45-147:49)

7             HEARING OFFICER:  Any other questions,

8        sir?

9             JOHN GALCZYNSKI:  Do you have access to

10       Mr. Sayers' email account?

11            KEVIN KIDD:  Yes.

12            JOHN GALCZYNSKI:  How often do you access

13       Mr. Sayers', Tom Sayers' email account?

14            (gap in recording 148:01-148:03)

15            JOHN GALCZYNSKI:  How often is that?

16            KEVIN KIDD:  On days off and when he's on

17       vacation.

18            JOHN GALCZYNSKI:  Was Mr. Sayers off in

19       the course of the post suspension period?

20            KELLY CHARLES-COLLINS:  Objection calls

21       for speculation.

22            HEARING OFFICER:  Okay.

23            KEVIN KIDD:  I don't know.

24            JOHN GALCZYNSKI:  Okay --

25            HEARING OFFICER:  Okay --

150

1     JOHN GALCZYNSKI:  -- you act as Manager

2    in charge when Mr. Sayers is not present?

3     KEVIN KIDD:  Yes.

4     JOHN GALCZYNSKI:  Are you required -- are

5    you required to be charged with Mr. Sayers'

6    knowledge, um of -- of what the, uh status is

7    of the store during that period?

8     KEVIN KIDD:  No, my job is to manage day

9    to day operations.

10     JOHN GALCZYNSKI:  So, when you say that

11    it's on an as needed basis that you access

12    Mr. Sayers' account after, um October, uh

13    after the suspension date, I believe it was

14    October 24th, did you access in the next, uh

15    10 days did you access Mr. Sayers --

16     KEVIN KIDD:  Let's clarify what access

17    means.

18     JOHN GALCZYNSKI:  Look at his email?

19     KEVIN KIDD:  Look in his Inbox.

20     JOHN GALCZYNSKI:  Okay, and did you in

21    looking at Mr. Sayers's Inbox view the email

22    relating to, um -- um Amy Barnes' transfer?

23     KEVIN KIDD:  Knowledge of that, it was

24    not in an email.

25     JOHN GALCZYNSKI:  Okay, let's go to, um

```
 1          after the suspension period, um after the --
 2          the suspension ended, um -- um Ms. Barnes was
 3          to appear on, um November 3rd or November 4th
 4          what did you -- you -- do you recall the date?
 5                 KEVIN KIDD:  I don't recall the date.
 6                 JOHN GALCZYNSKI:  Were you present at
 7          that point?
 8                 KEVIN KIDD:  That was the date she
 9          resigned, yes.
10                 JOHN GALCZYNSKI:  Okay, did you direct
11          Ms. Barnes to write a letter?
12                 KEVIN KIDD:  I suggested that she
13          document her resignation --
14                 JOHN GALCZYNSKI:  Can you use your words
15          that you said at the time rather than I --
16                 KEVIN KIDD:  I --
17                 KELLY CHARLES-COLLINS:  Objection --
18                 HEARING OFFICER:  Okay -- okay, now,
19          state your question again, please?
20                 JOHN GALCZYNSKI:  Can you use the words
21          rather than a conclusion, um as to what you
22          said to Ms. Barnes relating to the issuance of
23          the letter of, um separation?
24                 KELLY CHARLES-COLLINS:  Objection, he
25          answered the question.  He doesn't like the
```

```
1              answer, but he answered the question.
2                   HEARING OFFICER:  Okay, I'm going to
3              allow the answer, go ahead, do you remember
4              what you said to her regarding the letter
5              of resignation?
6                   KEVIN KIDD:  Word for word --
7                   JOHN GALCZYNSKI:  Yes, close as exact to
8              possible.
9                   (gap in recording 150:32-150:35)
10                  JOHN GALCZYNSKI:  Did you write the email
11             that, uh summarized that --
12                  KELLY CHARLES-COLLINS:  Objection --
13                  HEARING OFFICER:  What email?
14                  JOHN GALCZYNSKI:  There was email, uh
15             subsequent to that which indicates that --
16                  HEARING OFFICER:  You're talking about
17             after the separation?
18                  JOHN GALCZYNSKI:  Pardon?
19                  HEARING OFFICER:  You're talking about
20             after the date of separation?
21                  JOHN GALCZYNSKI:  Yes, there was an email
22             that he --
23                  HEARING OFFICER:  I --
24                  JOHN GALCZYNSKI:  -- directed her to
25             write it.  I believe those were the exact
```

1         words --

2              HEARING OFFICER:  Did -- did you ask her

3         to write the letter of resignation?

4              KEVIN KIDD:  No, I suggested to her, if

5         you want to you can document -- I told her it

6         would probably be best if you put it on paper.

7              JOHN GALCZYNSKI:  Why would the email

8         show something different than what --

9              KELLY CHARLES-COLLINS:  What, uh --

10             HEARING OFFICER:  I don't --

11             KELLY CHARLES-COLLINS:  Objection he's

12        referring to an email that's not in

13        evidence --

14             JOHN GALCZYNSKI:  Okay.

15             HEARING OFFICER:  What email is it?

16             JOHN GALCZYNSKI:  Introduce into evidence

17        this email right here --

18             HEARING OFFICER:  Well, what email is it?

19             JOHN GALCZYNSKI:  Hang on one second, it

20        is sent Wednesday, November 3rd, 2010 at

21        9:28 a.m. to Matt Crawley, Susan Says,

22        Steve McConnel.

23             KELLY CHARLES-COLLINS:  Okay, is -- I'm

24        going to object, Mr. Kidd is not on that email

25        is he?

154

```
1                    JOHN GALCZYNSKI:  That's correct --

2                    KELLY CHARLES-COLLINS:  So, therefore,

3          I'm going to ask that --

4                    HEARING OFFICER:  Let me find the email

5          first, okay, can we just -- November 2nd --

6                    KELLY CHARLES-COLLINS:  Let me help you.

7                    HEARING OFFICER:  No, I think I've got it

8          right here.

9                    JOHN GALCZYNSKI:  November 3rd.

10                    HEARING OFFICER:  That's what I'm -- I'm

11          assuming they're in order is what I'm --

12                    JOHN GALCZYNSKI:  Okay.

13                    HEARING OFFICER:  -- okay, that's why I

14          said I was -- November -- he's not on this

15          email so I'm not going to allow the question.

16                    JOHN GALCZYNSKI:  All right.

17                    HEARING OFFICER:  Okay, next question.

18                    JOHN GALCZYNSKI:  My next question is how

19          did you --

20                    AMY E. BARNES:  He saw the email --

21                    KELLY CHARLES-COLLINS:  Can I ask that

22          you --

23                    AMY E. BARNES:  -- told him.

24                    KELLY CHARLES-COLLINS:  I'm going to ask

25          that you direct Ms. Barnes --
```

1                      HEARING OFFICER:  Okay -- okay,

2               Ms. Barnes, if you're going to have a

3               representative he's got to be your

4               representative.  I can't have both

5               of you --

6                      AMY E. BARNES:  Okay, that's fine --

7                      HEARING OFFICER: -- acting as a

8               representative, okay -- okay.

9                      JOHN GALCZYNSKI:  Okay, um how did, um

10              did you accept this letter from Ms. Barnes?

11                     KEVIN KIDD:  Did I accept it?

12                     JOHN GALCZYNSKI:  Yeah, in other words

13              there was a handwritten letter and how did you

14              accept it?  Did somebody hand it to you, did

15              she hand it to you?  How did you accept it?

16                     KEVIN KIDD:  I don't recall.  She might

17              have handed it to Tom.

18                     JOHN GALCZYNSKI:  Was Tom there on that

19              day?

20                     KEVIN KIDD:  Yes.

21                     JOHN GALCZYNSKI:  Was he there at that

22              time?

23                     KEVIN KIDD:  Yes.

24                     JOHN GALCZYNSKI:  Um did Tom ask you

25              while he was there to deal with Ms. Barnes

1           relating to this letter?

2                KEVIN KIDD:  No.

3                JOHN GALCZYNSKI:  So, it -- it indicates

4           that --

5                KELLY CHARLES-COLLINS:  I'm going to

6           object to --

7                HEARING OFFICER:  Now, he hasn't even

8           said the question, ma'am, you have to let him

9           give the question and then, you can object or

10          not object.

11               JOHN GALCZYNSKI:  It indicates in this

12          email by Tom Sayers that we had her write a

13          resignation letter.  My question -- I'm sorry

14          are you coaching the witness?

15               KELLY CHARLES-COLLINS:  No, I was telling

16          him not to answer.

17               HEARING OFFICER:  Okay, all right, that's

18          a statement that's not a question, are you

19          forming in a question --

20               JOHN GALCZYNSKI:  Okay.

21               HEARING OFFICER:  -- please?

22               JOHN GALCZYNSKI:  Yes, I am, did you read

23          this email?

24               KEVIN KIDD:  No, I didn't know that email

25          existed.

```
 1              JOHN GALCZYNSKI:  Did you write the
 2         email?
 3              KEVIN KIDD:  I didn't --
 4              JOHN GALCZYNSKI:  I understand that,
 5         did you --
 6              HEARING OFFICER:  If he didn't know it
 7         existed how can he write the email?
 8              KEVIN KIDD:  No, I did not.
 9              JOHN GALCZYNSKI:  All right, did
10         Tom Sayers write this email?
11              KEVIN KIDD:  Objection, calls for --
12              HEARING OFFICER:  Okay -- okay, sir, I'm
13         not going to allow this question.
14              JOHN GALCZYNSKI:  Okay.
15              HEARING OFFICER:  Because he has no
16         knowledge of it.
17              JOHN GALCZYNSKI:  So --
18              HEARING OFFICER:  Move on to the next
19         question or we're going to --
20              JOHN GALCZYNSKI:  Did you ask Ms. Barnes
21         to write this letter just like it says here --
22              KELLY CHARLES-COLLINS:  Objection, asked
23         and answered.
24              KEVIN KIDD:  I'm going to --          |
25              HEARING OFFICER:  Okay, he's answered
```

158

```
1              that and I'm going to sustain the objection

2              because he's answered --

3                   JOHN GALCZYNSKI:  Okay.

4                   HEARING OFFICER:   -- more than once now.

5                   JOHN GALCZYNSKI:  Okay, um --

6                   KEVIN KIDD:  Let me --

7                   KELLY CHARLES-COLLINS:  No, if he

8              sustains that means no.

9                   KEVIN KIDD:  Okay.

10                  JOHN GALCZYNSKI:  Um did you in any way

11             say or do, uh something that would indicate to

12             Ms. Barnes that she was required to, um write

13             this email?

14                  (gap in recording 155:08-155:13)

15                  JOHN GALCZYNSKI:  What did you say

16             exactly?

17                  KELLY CHARLES-COLLINS:  Objection, asked

18             and answered.

19                  HEARING OFFICER:  Okay, I sustain the

20             objection because he's answered that on

21             multiple times --

22                  JOHN GALCZYNSKI:  Okay.

23                  HEARING OFFICER:  -- at this point, any

24             other questions for him, sir?

25                  JOHN GALCZYNSKI:  Um yes, did you feel
```

1           that, um Mr. Sayers, um and Ms. Barnes did not
2           get along or that there were, um motivations
3           for Ms. Barnes seeking a transfer?
4               KELLY CHARLES-COLLINS:  Objection, calls
5           for speculation --
6               HEARING OFFICER:  Okay, speculation, I'm
7           not going to allow the question.
8               JOHN GALCZYNSKI:  Okay, all right.
9               HEARING OFFICER:  It would just be his
10          opinion I don't think it would be relevant.
11              JOHN GALCZYNSKI:  Okay, at the time of
12          this resignation did -- did you see that, uh,
13          um Ms. Barnes was, um pushed in any way from
14          your point of view?
15              (gap in recording 156:02-156:06)
16              JOHN GALCZYNSKI:  Um did you do anything
17          that would threaten her or, um otherwise
18          intimidate her into writing this letter?
19              (gap in recording 156:14-156:16)
20              JOHN GALCZYNSKI:  Okay, uh I have no
21          further questions.
22              HEARING OFFICER:  Okay, at this point I'm
23          going to have to end the hearing toady.  And I
24          apologize, but I'm running out of time.
25              I'm sorry we're not going to be able to

160

```
1          finish today and we're at a stopping point.  I
2          mean I -- I am not the Lord I can't --
3               KELLY CHARLES-COLLINS:  No, I know --
4               HEARING OFFICER:  -- perform miracles,
5          okay?  So, uh I'm going to stop it at this
6          time.  What I'm going to do I'm going to ask
7          each party do you have any not available
8          dates?  And I'll begin with the Employer,
9          ma'am, I'll ask you first, um Ms. Collins?
10              KELLY CHARLES-COLLINS:  I'm not sure.
11              HEARING OFFICER:  Okay, yeah, I'll have
12         to let me bring --
13              KELLY CHARLES-COLLINS:  Wait, can I ask I
14         don't know how the --
15              HEARING OFFICER:  Go ahead.
16              KELLY CHARLES-COLLINS:  Is it possible
17         that we can schedule this for like a whole
18         day?
19              HEARING OFFICER:  We may have to, ma'am.
20              KELLY CHARLES-COLLINS:  Because --
21              HEARING OFFICER:  I may have to ask for
22         that because I -- I don't -- I do not have the
23         authority to --
24              KELLY CHARLES-COLLINS:  Right.
25              HEARING OFFICER:  -- that, but I can ask
```

```
1              for it and --
2                   KELLY CHARLES-COLLINS:  And the only
3              reason I say that was because last time with
4              less witnesses we did probably about
5              five hours of testimony.
6                   HEARING OFFICER:  Yeah.
7                   KELLY CHARLES-COLLINS:  With less than
8              the number of witnesses we have now and we
9              keep bringing all these management people out
10             of our stores and this is about the
11             seventh time --
12                  HEARING OFFICER:  I understand, I can ask
13             -- I don't have the -- I'm not the one that
14             grants that or not --
15                  KELLY CHARLES-COLLINS:  But if we
16             could --
17                  HEARING OFFICER:  I'll ask for it, okay?
18                  KELLY CHARLES-COLLINS:  Okay.
19                  HEARING OFFICER:  I have no problem with
20             asking for it.  I want to finish this as much
21             as both parties want to finish this.
22                  AMY E. BARNES:  You're free -- you're
23             free.
24                  KELLY CHARLES-COLLINS:  Let me see,
25             June 30^th, July 7^th, July 15^th through
```

```
1              the 21st, July 27th.  I think that's it for now
2              I don't have my work calendar on here, but
3              I'll just, uh no, that's what I know for now.
4              Once I get back I'll --
5                   HEARING OFFICER:  Can I have you -- you
6              have a notice right there --
7                   KELLY CHARLES-COLLINS:  Uh-hmm.
8                   HEARING OFFICER:  -- if you'll put just
9              Region 2 with the Docket Number --
10                  KELLY CHARLES-COLLINS:  Okay.
11                  HEARING OFFICER:  -- and instead of
12             bringing all these witnesses back and having
13             to go --
14                  KELLY CHARLES-COLLINS:  Okay.
15                  HEARING OFFICER:  -- if you'll email me
16             not available dates with that Docket Number
17             and that region number within 24 hours I'll
18             let you do it that way --
19                  KELLY CHARLES-COLLINS:  Okay, thank you,
20             we'll do that.
21                  HEARING OFFICER:  Okay, sir --
22                  JOHN GALCZYNSKI:  I'm going to request to
23             be cc'd on that as well just so that I know
24             that --
25                  HEARING OFFICER:  No, you'll be -- I'm
```

```
1              not going to require them to cc you.
2                   JOHN GALCZYNSKI:  Okay.
3                   HEARING OFFICER:  You'll -- I'm going to
4              ask you as well if you have any not
5              available dates?
6                   JOHN GALCZYNSKI:  Yes, the fifth of July.
7                   HEARING OFFICER:  July 5ᵗʰ, okay, and any
8              -- any other dates, sir, do you have any --
9                   INTERPRETER CELIO BEST:  I don't --
10                  HEARING OFFICER:  -- do you have any
11             yourself?  The Interpreter do you have any
12             not --
13                  INTERPRETER CELIO BEST:  Oh, I don't have
14             any -- right now, uh I don't know my schedule.
15                  HEARING OFFICER:  Uh-hmm.
16                  INTERPRETER CELIO BEST:  But we have
17             another person that can --
18                  HEARING OFFICER:  Okay -- okay.
19                  INTERPRETER CELIO BEST:  -- if you want
20             specifically me then, I can send you --
21                  HEARING OFFICER:  I think it would -- I'd
22             prefer it to be --
23                  INTERPRETER CELIO BEST:  The same person?
24                  HEARING OFFICER:  The same person
25                  INTERPRETER CELIO BEST:  I can send you
```

```
 1              available dates --
 2                 HEARING OFFICER:  Hold on, uh I've got
 3              another copy of this somewhere.
 4                 INTERPRETER CELIO BEST:  Email?
 5                 HEARING OFFICER:  Yeah, you can email --
 6                 INTERPRETER CELIO BEST:  Okay, sure --
 7              sure.
 8                 HEARING OFFICER:  Okay, I'll make another
 9              copy of that, okay?
10                 INTERPRETER CELIO BEST:  Okay, sure.
11                 HEARING OFFICER:  And I'm sorry about
12              this for both sides.  But it's out of my
13              control so we'll meet again.
14                 KELLY CHARLES-COLLINS:  Okay.
15                 HEARING OFFICER:  Okay.
16                 JOHN GALCZYNSKI:  Certainly.
17                 INTERPRETER CELIO BEST:  Thank you.
18                 KELLY CHARLES-COLLINS:  Thank you.
19                 JOHN GALCZYNSKI:  Thank you.
20                 INTERPRETER CELIO BEST:  Can I ask a
21              favor, uh or not a favor --
22                 HEARING OFFICER:  Will y'all stay I don't
23              want anything said --
24                 KELLY CHARLES-COLLINS:  Okay.
25                 HEARING OFFICER:  -- what?
```

```
 1              INTERPRETER CELIO BEST:  When we done, uh
 2       the paper that we need to sign I just need you
 3       to put it -- I need to pull up my email --
 4            HEARING OFFICER:  I don't have -- I'm not
 5       allowed -- you can go out in the lobby and see
 6       if you can use their --
 7            INTERPRETER CELIO BEST:  They have some
 8       for the --
 9            HEARING OFFICER:  Yeah, you can ask them
10       if they'll let you use it out there, but I
11       can't --
12            INTERPRETER CELIO BEST:  Okay, that will
13       be fine if they'll let me use it I'll just
14       pull it up.
15            HEARING OFFICER:  Okay, and --
16            INTERPRETER CELIO BEST:  That I was,
17       actually, here.
18            HEARING OFFICER:  -- you can ask the
19       people up front if they'll bring it back to me
20       and I'll sign it.
21            INTERPRETER CELIO BEST:  Okay, sure that
22       will be great.
23            HEARING OFFICER:  Okay -- okay, they'll
24       let you that's fine, I can't let you use my
25       computer.
```

166

```
1                 INTERPRETER CELIO BEST:  Okay, that's
2            fine, I can understand that.
3                 HEARING OFFICER:  Okay.
4                 JOHN GALCZYNSKI:  Does that
5            conclude this --
6                 HEARING OFFICER:  Yes, sir, y'all have a
7            nice day.
8                 KELLY CHARLES-COLLINS:  Thank you -- you
9            too.
10                INTERPRETER CELIO BEST:  You too.
11                HEARING OFFICER:  Thank you, have a nice
12           day.  Y'all have a nice day.
13                INTERPRETER CELIO BEST:  All right, I'll
14           have to bring it back to you.
15                HEARING OFFICER:  Well, no, when you ask
16           them up front to tell me I'll come out and
17           I'll -- I'll sign it.
18                INTERPRETER CELIO BEST:  Okay, sure,
19           okay, uh also your, uh name on here, also
20           because I'll look at this later on and I'll
21           go, uh what's his name again?  Thank you, sir.
22                HEARING OFFICER:  Uh-hmm.
23                INTERPRETER CELIO BEST:  Did you -- did
24           you have a certain day that was available for
25           you?
```

1            HEARING OFFICER:  No, I'll need not

2        available dates you can email that --

3            INTERPRETER CELIO BEST:  Okay, sure.

4            HEARING OFFICER:  Either way.

5            INTERPRETER CELIO BEST:  All right,

6        thank you.

7            HEARING OFFICER:  All parties out of the

8        office.  It's 3:37 p.m. going off record.

9                   HEARING CONCLUDED

168